

Louis Lucas, Memphis, Tenn., Thomas I. Atkins, Boston, Mass., for plaintiffs.

George T. Roumell, Jr., Theodore Sachs, Detroit, Mich., George L. McCargar, Jr., Asst. Atty. Gen., Lansing, Mich., for defendants.

**Ronald BRADLEY et al., Plaintiffs,**

v.

**William G. MILLIKEN, Governor of the State of Michigan, et al., Defendants.**

Civ. No. 35257.

United States District Court, E. D. Michigan, S. D.

Sept. 6, 1979.

## MEMORANDUM OPINION

DeMASCIO, District Judge.

The defendant Detroit Board of Education petitioned the court for approval of a proposed pupil reassignment plan that would reduce from 21,500 to 15,000 the number of students transported for desegregation, a reduction of 6500 students. In support of its petition, the Detroit Board reminds us that the school district is now 85% black, that there are not enough white students to continue the current pupil reassignment plan, and that the current plan transports black students to predominantly black schools. Since the Detroit Board has always transported approximately 14,500 students for purposes unrelated to desegregation, the practical effect of the proposed plan is to eliminate all transportation for desegregative purposes.[1]

The plaintiffs are opposed to any modification of the current student reassignment plan. They contend that, since the Detroit Board's appeal of our August 7, 1978 opinion and order is pending, we lack jurisdiction to entertain the instant petition. In that opinion, we concluded that a greater degree of desegregation could be achieved in Regions 1 and 2. The Detroit Board

---

1. The evidence produced by the Detroit Board of Education at the remedial hearings in 1975 established that 14,400 students were transported to relieve overcrowding, to avoid dangerous crossings and for special education. *See Bradley v. Milliken*, 402 F.Supp. 1096, 1134 (E.D.Mich.1975).

responds that we do have jurisdiction because its proposed plan does not affect Regions 1, 5 and 8, the specific regions we were directed to reconsider by the Court of Appeals. *See Bradley v. Milliken*, 540 F.2d 229, 239–40 (6th Cir. 1976).

We decline to approve a plan that reduces the number of students transported for desegregative purposes at a time when we have concluded that a greater degree of desegregation is possible in Region 1 by using students from Region 2. If we were to grant the Detroit Board's petition to reduce by 6500 the number of students transported, the ultimate result would be that students would no longer be transported for desegregative purposes. If the Detroit Board wishes to achieve that result, it should say so forthrightly so that the parties and the entire school community may know the goals the Detroit Board seeks to achieve.

We are greatly concerned with the manner in which the Detroit Board sought to modify the pupil reassignment portion of our desegregation order. Counsel for the plaintiffs advised the court that, on several occasions, the general superintendent had publicly announced his intention to reduce the number of students being transported. As it later developed, the general superintendent, without first petitioning the court, had actually forwarded written notices advising 6500 students of a change in their school assignment.[2] The Detroit Board did not file the instant petition until plaintiffs' counsel reminded the general superintendent that prior court approval was required for any modification of the current student assignment plan.

We are concerned as well with the efforts of the Detroit Board to implement the court ordered remedial programs. After reviewing the March 21, 1979 Monitoring Commission Report, we concluded that the Detroit Board has knowingly failed to implement the remedial programs ordered by the court in 1975. The evidence presented at the July 23, 1979 hearing on the Monitoring Commission Report fully supports our conclusion. That report, now a part of this record, is unrefuted and establishes that the Detroit Board is lagging in its implementation of court ordered remedial programs. For example, a Monitoring Commission Subcommittee has repeatedly advised that the Uniform Code of Student Conduct has not been applied uniformly. The Subcommittee pointed out that *illegal* behavior resulted in suspensions after the first incident in some schools, while repeated incidents of the same offense in other schools resulted in exclusions. In some schools, students were being excluded or suspended for being truant from school or class, while in other schools the infraction was completely overlooked.[3] The Monitoring Commission also found that the school system did not have a definitive counseling and career guidance program. In the majority of the city high schools, counselors were spending much of their time on recordkeeping chores and clerical duties associated with student discipline rather than performing counseling and guidance functions. There are serious differences among the various regions over the appropriate functions of a counselor. The evidence developed at the July 23, 1979 hearing also disclosed that the school-community relations program functions in some schools and is non-existent in others.

Moreover, the Monitoring Commission has focused our attention on the fact that the Detroit Board has not really given a high priority to implementing the court ordered remedial programs. The Monitoring Commission agrees that the administrative structure of the school system makes it impossible to uniformly implement the remedial programs. There is no one in the school system with authority to direct the

2. When we orally denied its petition, the Board sent a second notice which reinstated the court ordered plan. By attempting to circumvent the court order, the Detroit Board unnecessarily created a chaotic condition. The court has been inundated with telephone calls from par-ents of students receiving the second notice wishing an explanation from the court for the confusion caused by the Detroit Board.

3. *See* Summary Report—Student Code of Conduct Subcommittee—August 8, 1978.

day-to-day implementation of these remedial programs. Although we have cast much of the responsibility to implement these programs upon the general superintendent, he has not succeeded. We are persuaded that he has not willfully failed to do so in contempt of our order; he simply does not have on-line authority to direct the day-to-day implementation of court orders.

In response to suggestions made by the plaintiffs to cure these glaring deficiencies, the Detroit Board asserts that the responsibility to implement court orders rests with it and its administrators and that plaintiffs' suggestion to restructure the internal procedures of the Detroit Board will impede rather than expedite the implementation effort. Although it believes that it has implemented the remedial programs, the Detroit Board points out that rather than engage in a prolonged hearing, it would acknowledge that there is room for improvement. In response to the Monitoring Commission Report, the Detroit Board has advanced new and additional techniques for implementing the remedial programs. The Detroit Board again acknowledges its willingness to carry out the court ordered programs and suggests that the proper recourse to follow in the event it fails to do so is for the court to invoke its contempt powers rather than adopt plaintiffs' proposals for centralized implementation.

Even if we assume that the Detroit Board remains willing to implement the court ordered remedial programs, we are persuaded that the present administrative structure so diffuses responsibility that uniform implementation is impossible. If the general superintendent is willing to implement the programs, he clearly lacks the authority to do so.[4] The plaintiffs have made several suggestions for curing the deficiencies reported by the Monitoring Commission at the July 23, 1979 hearing. We are persuaded that the court must act

to ascertain that its orders can be implemented. We agree with plaintiffs that the court should hold hearings at which all parties may be heard before deciding upon a solution for the problems that exist. An appropriate order will be entered.

IT IS SO ORDERED.

---

4. Although the court ordered the state to provide one-half of the funds necessary to finance court ordered remedial programs, the general superintendent has been unable to obtain the information requested by the state so that the state superintendent could verify the total cost of the court ordered programs and seek appropriation of one-half that amount.

*See* attorney general's August 13, 1979 letter to the court and attachment addressed to Dr. Arthur Jefferson, dated June 18 and August 9, 1979.