Oliver BROWN et al., Plaintiffs,

and

Charles and Kimberly Smith, minor children, by their Mother and next friend, Linda Brown Smith, Danielle Threatt, a minor child, by her Mother and next friend, Juda Gaines, Shawn, Tanya and Tara Woods, minor children, by their Mother and next friend, Joyce Woods, Cordellia Mitchell and Connie Maxwell, minor children, by their Mother and next friend, Barbara Mitchell, Arlene Jackson, a minor child, by her Mother and next friend, Charlene Burkes, Carlesia and Cheryl Robinson, minor children, by their Mother and next friend, Patricia Robinson, Rufus D. and Michelle Kelley, minor children, by their Father and next friend, Rufus Kelley, John, Jackie, Johnny and Viola Davis, minor children, by their Mother and next friend, Ruby Davis, Intervening Plaintiffs,

v.

BOARD OF EDUCATION OF TOPEKA, SHAWNEE COUNTY, KANSAS, et al., Defendants.

No. T–316.

United States District Court, D. Kansas.

Nov. 29, 1979.

Richard E. Jones, Charles Scott, Sr. and Charles Scott, Jr., Joseph D. Johnson, Topeka, Kan., Bruce J. Ennis, Jr., Nonresident Atty., National Legal Director of the American Civil Liberties Union, New York City, E. Richard Larson, Nonresident Atty., New York City, for intervenors.

Charles N. Henson, Jr., K. Gary Sebelius, Topeka, Kan., for defendants.

ROGERS, District Judge.

## I. INTRODUCTION

On August 22, 1979, certain Black parents and school children currently enrolled in Unified School District # 501 filed two motions in this case: (1) Motion to Intervene as Named Plaintiffs, and (2) Motion For An Order Commanding Compliance With the Supreme Court Mandate to Desegregate the Schools in the Case of *Brown v. Board of Education of Topeka,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. This case comes before the Court for decision on the motion to intervene. The Court is now prepared to rule upon the request that another chapter be written in what has been termed "the Case of the Century." [1]

## II. HISTORICAL SETTING

The Court deems it appropriate and helpful to set forth in some detail the history of

---

1. H. Speer, The Case of the Century: A Historical and Social Perspective on *Brown v. Board of Education of Topeka* With Present and Future Implications, 1 (1968).

school desegregation litigation in Topeka. Many of the facts which will appear in this background discussion are relevant to a resolution of the pending motion to intervene.

## A. *BROWN v. BOARD OF EDUCATION, T–316.*

This historic action was commenced on February 28, 1951. The amended complaint, filed March 22, 1951, reflects that plaintiffs were twenty Black elementary school students who brought this action by and through their parents. Defendants included the Board of Education of Topeka, the superintendent of the Topeka Public Schools, and the principal of an elementary school.

The complaint alleged that while White Children of elementary school age were allowed to go to the school within the designated boundaries of the school district within which they lived, the plaintiffs were forced to leave the districts within which they lived to attend separate all-Negro schools solely on the basis of race in violation of the Fourteenth Amendment to the Constitution of the United States.

The case was filed as a class action; the complaint alleged:

Plaintiffs bring this action on their own behalf and also on behalf of all citizens similarly situated and affected, pursuant to Rule 23A of the Federal Rules of Civil Procedure, there being common questions of law and fact affecting the rights of all Negro citizens of the United States similarly situated who reside in cities in the State of Kansas in which separate public schools are maintained for white and Negro children of public school age, and who are so numerous as to make it impracticable to bring them all before the Court.

Plaintiffs requested injunctive and declaratory relief. The ruling of the court was sought as to the following questions:

(a) The question of whether the state statute Ch. 72–1724 of the General Statutes of Kansas, 1935, is unconstitutional in that it gives to defendants the power to organize and maintain separate schools for the education of white and colored children in the City of Topeka, Kansas.

(b) The question of whether the customs and practices of the defendants operating under Ch. 72–1724 of the General Statutes of Kansas, 1935, are unconstitutional in that they deny infant plaintiffs the rights and privileges of enrolling, attending and receiving instruction in public schools of the district within which they live while such rights and privileges are granted to white children similarly situated; where the basis of this refusal and grant is the race and color of the children, and that alone.

(c) The question of whether the denial to infant plaintiffs, solely because of race, of educational opportunities equal to those afforded white children is in contravention of the Fourteenth Amendment to the United States Constitution as being a denial of the equal protection of the laws.

On June 11, 1951, the State of Kansas intervened as a defendant in the case. Trial to a three-judge court was held on June 25 and 26, 1951. The Court's findings of fact, conclusions of law, and opinion were filed on August 3, 1951. 98 F.Supp. 797. There were two major aspects to the court's holding. First, it was held that the evidence showed the schools for Black children and the schools for White children were comparable in facilities, curricula, courses of study, and quality of teachers. Second, the court, citing *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) and *Gong Lum v. Rice,* 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172 (1927), declined to hold that segregation of the races, *per se,* was a violation of the Fourteenth Amendment.

Plaintiffs appealed the three-judge court's decision to the United States Supreme Court where the case was consolidated with similar actions from South Carolina, Virginia, Delaware, and the District of Columbia. The Supreme Court rendered its momentous decision (*"Brown I"*) on May 17, 1954. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. Speaking for a unanimous Court, Chief Justice Warren framed the issue as follows:

Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other "tangible" factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does.

In explaining the ruling, the opinion relied heavily upon a finding of fact issued by the trial court in this case. Justice Warren wrote:

> To separate [children in grade and high schools] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs:
>
> > "Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of the child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system."

. . . . .

We conclude that in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. [347 U.S. at 494–495, 74 S.Ct. at 691–692]

The Supreme Court's opinion concluded by ordering reargument on the issue of relief in light of the "considerable complexity" of the matter due to the fact, *inter alia,* that "these are class actions." 347 U.S. at 495, 74 S.Ct. 686.

The Supreme Court's order on relief (*"Brown II"*) was issued on May 31, 1955. 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. Recognizing the variety of problems that would be confronted and the essentially local nature of the responsibility for education, the opinion remanded the cases to the trial courts for further hearings. The trial courts were directed to "require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling." [349 U.S. at 300, 75 S.Ct. at 756]. Noting that the trial courts should hold such proceedings and enter such orders as would be necessary to admit the plaintiffs to public schools on a racially nondiscriminatory basis with "all deliberate speed," the Supreme Court directed that "[d]uring this period of transition, the [trial] courts will retain jurisdiction of these cases." [349 U.S. at 301, 75 S.Ct. at 756].

In accordance with the Supreme Court's mandate, the three-judge court held a hearing on August 24, 1955, to determine whether the Topeka school board's proposed four-step desegregation plan would fully comply with the Supreme Court's decision in *Brown I.* The court's decision, rendered on October 28, 1955 [139 F.Supp. 468], concluded as follows:

> It is the conclusion of the court that while complete desegregation has not been accomplished in the Topeka School System, a good faith effort toward that end has been made and that, therefore, the plan adopted by the Board of Education of the City of Topeka be approved as a good faith beginning to bring about complete desegregation. Jurisdiction of the cause for the purpose of entering the final decree is retained until such time as the Court feels there has been full compliance with the mandate of the Supreme Court. [139 F.Supp. at 470]

Although the school board's four-step plan was fully implemented by September 1, 1961, no further orders were issued by the Court in this case. At no time has this Court held that the Topeka school system was (or was not) in "full compliance" with the Supreme Court's rulings.

It appears that there was no further litigation regarding desegregation of the Topeka school system until the filing of *Johnson v. Whittier,* No. T–5430.

### B. *JOHNSON v. WHITTIER, T–5430.*

*Johnson* was filed on September 10, 1973. Defendants included various state agencies and officials and the board of education of Unified School District # 501, successor to the Topeka board of education.[2] *Johnson* was filed as a class action brought on behalf of a class originally defined as all Black children who were then or had during the past ten years been students of elementary and junior high schools in East Topeka and North Topeka. The complaint concentrated more on equality of facilities than distribution of students, alleging that the children in West Topeka and South Topeka received vastly superior educational facilities and opportunities, including buildings, equipment, libraries and faculties, than could be obtained by students in the areas of East Topeka and North Topeka, which contained higher percentages of minority students. *Johnson* requested injunctive relief and damages in the sum of $10,000 actual damages and $10,000 punitive damages for each of an estimated 10,000 class members.

Judge Templar denied class action status in an order dated October 9, 1975. An appeal of that order was dismissed by the Tenth Circuit, and certiorari was denied by the Supreme Court. The case proceeded for a time as an individual action and was eventually settled and dismissed on December 15, 1978.

Several notable features of the *Johnson* case should be briefly mentioned. First, the filing of the *Johnson* case spawned an investigation by the Department of Health, Education and Welfare into the practices of the Topeka public schools regarding race discrimination. This investigation led to the filing of *U. S. D. # 501 v. Weinberger,* No. 74–160–C5, to be discussed *infra.* On August 27, 1974, plaintiff in *Johnson* moved to consolidate that action with the *Weinberger* case and with this case. The motion to consolidate, so far as we can determine from the file, was never decided.

Second, we note that throughout the course of the *Johnson* litigation it was the position of defendant school board that the action should be dismissed and plaintiff should be required to intervene in this case in order to press her discrimination claim. On May 29, 1973, the board of education moved to dismiss the *Johnson* case, stating:

> In support hereof, movant would show that the issues herein are already subject to the jurisdiction of this Court, retained in *Brown v. Board of Education of Topeka,* 139 F.Supp. 468 (1955), where no final decree has been entered.

In a brief filed on March 3, 1977, the school board made the following statement in opposing plaintiff's motion for reconsideration of the class action issue:

> The District Court in *Brown* has never entered a decree ending its jurisdiction respecting desegregation of Topeka schools and none of the *Brown* Plaintiffs have filed objections to its plan of desegregation approved by the Court and carried out by the school administration.
>
> By September 1, 1963, the desegregation plan was fully implemented. Since that time, the Topeka school system has been maintained according to the approved plan, as a completely desegregated neighborhood system.
>
> The Plaintiff in this case should not be allowed to maintain this action independently of *Brown;* but should be required to file a motion to intervene in *Brown.*

---

**2.** On July 1, 1966, Kansas law replaced the Board of Education of Topeka, also known as Topeka School District No. 23, Shawnee County, Kansas with Unified School District # 501.

This action should simply be dismissed. [Brief at p. 23] [3]

When no ruling was made on the motion to dismiss, the school board filed a motion requesting such a ruling. On August 24, 1978, the motion requesting a ruling was orally overruled for unspecified reasons.

Finally, we note that Judge Templar, in his order denying class certification, stated:

The actions pending in this Court, *Unified School District No. 501 v. Weinberger,* No. 74–160–C5, and *Brown v. Board of Education,* Civil Action No. T–136, while not technically class actions, are consolidated actions brought to obtain the identical declaratory and injunctive relief sought by the plaintiff. These actions are already commenced and are pending an early disposition. [Order, p. 8]

On the basis of the pendency of *Weinberger* and *Brown,* Judge Templar held that *Johnson's* claim for declaratory and injunctive relief could not proceed as a class action because it did not meet the requirement of F.R.Civ.P. 23(b)(3) that the class action be superior to other methods available for the fair and efficient resolution of the controversy.

### C. U. S. D. # 501 v. WEINBERGER, 74–160–C5.

As indicated above, the filing of the *Johnson* suit apparently led to initiation of an investigation of the Topeka schools by H.E.W. That investigation resulted in H.E. W.'s conclusion that the Topeka schools were not in full compliance with the law regarding desegregation. Therefore, pursuant to 42 U.S.C. § 2000d–5, H.E.W. prepared to cut off federal aid to the Topeka schools and scheduled an administrative hearing on the matter.

On August 7, 1974, U.S.D. # 501 filed an action to enjoin the cut off of federal funds and to enjoin H.E.W. from holding the administrative hearing. It was the school board's theory that *Brown v. Board of Edu-*

*cation* was still an open case and that H.E.W. was thereby precluded from holding an administrative hearing by 45 C.F.R. 80.-4(c), which stated that a school system shall be deemed to be in compliance with the relevant statutes if it "is subject to a final order of a court of the United States for the desegregation of such school or school system." [Complaint, p. 4]

At the August 15, 1974 preliminary injunction hearing, the school Board's attorney Porter made the following statement concerning the board's position:

And then in this decision [of October 28, 1955] the District Court approved a plan for desegregation, which had been submitted by the Defendant Board of Education. The Court—the District Court in this latter decree, which I refer to specifically retained jurisdiction for the purpose of entering it's [sic] Final Decree until such time as the Court feels that there has been full compliance with the mandate of the Supreme Court. And the allegations and contentions are that the Court has exclusive jurisdiction to determine whether or not the Topeka school system is in violation of the Final Order or Judgment and the Court approved plan for desegregation. [Tr. 7]

During the hearing, the school board placed Dr. Merle Bolton, then Superintendent of Schools in U.S.D. # 501 on the witness stand. When queried regarding the status of this action, Dr. Bolton stated: "I don't think there is any question about the fact that this school system has been under Court Order." [Tr. 52]

H.E.W. took the position that the October 28, 1955 order of the three-judge court was not a final order within the meaning of the pertinent regulation. The H.E.W. attorney also stressed that while the original plaintiffs in our case were attacking segregation at only the elementary school level, H.E.W. was charged with investigating discrimination in all its aspects at all levels of the public school system. [Tr. 76]

---

**3.** *See also* March 3, 1977 brief at p. 25, and the statement of counsel Fisher at May 3, 1977 hearing, Tr. 8.

Noting that 42 U.S.C. § 2000(d)–5 provided that compliance with "a final order or judgment of a Federal court for the desegregation of the school or school system" should be deemed compliance with the statute, Judge Templar granted U.S.D. # 501's motion for a preliminary injunction by order of August 23, 1974. Judge Templar emphasized the wording of the October 28, 1955 order in which the three-judge court retained jurisdiction of the action, and he characterized said order as a final appealable judgment. Judge Templar wrote, in part:

The opinion and order of this Court constituted a judgment. The fact that jurisdiction was retained for the purpose of giving the matter further consideration did not make the opinion and order any less a judgment. Many judgments are entered by this Court with the provision that jurisdiction be reserved for the purpose of seeing to it that the Court's judgment is carried out correctly. 10 *Wright & Miller, Federal Practice & Procedure,* § 2651, p. 14; *Rodriquez v. San Antonio School District,* 337 F.Supp. 280. [Order at p. 5]

Judge Templar, in language quite relevant to the matter at hand, further stated:

This Court is open and available to hear any charges or claims that legal requirements have not been met by the School District as it relates to racial discrimination condemned in *Brown v. School Board.* [Order at p. 7]

The *Weinberger* case was eventually dismissed by stipulation of the parties on October 20, 1976.

### D. *MILLER v. BOARD OF EDUCATION, 79–1408,* and *CHAPMAN v. BOARD OF EDUCATION, 79–1473.*

The *Miller* case is a class action filed on August 8, 1979. The complaint alleges illegal segregation in U.S.D. # 501 and requests injunctive relief, including cross-town busing.

*Chapman* was filed on September 7, 1979. It is a class action alleging illegal segregatory practices and requesting primarily monetary relief for a proposed class of 10,-000 along the lines of *Johnson v. Whittier.*

No substantial activity has yet occurred in either case.

### E. *THE PENDING MOTION TO INTERVENE.*

An attempt is now being made to reactivate this case as a part of the latest round of desegregation litigation in Topeka. Various Black children who attend grade schools, junior high schools, and high schools in Topeka have sought by and through their parents to intervene as named plaintiffs in this action.[4] Served as defendant is U.S.D. # 501. The State of Kansas was not served and has been dismissed from the action upon agreement of the parties.

The applicants for intervention assert that this action is still open for such intervention, that they are members of the original class represented in this case, that the original named plaintiffs do not have a sufficient interest in the matter to represent applicants' interests, and that applicants are "successors" to the original named plaintiffs, and have a current stake in the litigation. Applicants wish to appear before this Court to request a further exercise of the Court's jurisdiction in order to review and mandate compliance with the Supreme Court's decisions in *Brown I* and *Brown II.*

If allowed to intervene, applicants would claim that the defendant has failed to comply with the Supreme Court mandate in the following respects:

1. The School District has established school attendance zones which perpetuate racially segregated schools;

2. The facilities, equipment, curriculum and instruction provided in those schools with disproportionately high Black enrollment are substantially inferior to those provided for the schools where there is a disproportionately high White enrollment;

4. It is interesting to note that Linda Brown Smith whose name graces the caption of this case is one of the present applicants acting on behalf of her children.

3. Black teachers, counselors and other Black personnel are assigned to schools where Black enrollment is disproportionately high. White teachers, counselors and other White personnel are assigned to schools where White enrollment is disproportionately high;

4. The School District has adopted and implemented an open enrollment policy which will continue to perpetuate racially segregated schools; and

5. The long range facilities plan adopted and implemented by the School District further perpetuates the racially segregated schools.

The motion for leave to intervene was filed on August 22, 1979. On October 17, 1979, defendant U.S.D. # 501 filed a brief in opposition to the motion. Oral judgment was held on November 9, 1979, and the Court is now prepared to rule.

## III. STATEMENT OF THE ISSUE.

It should be emphasized that the merits of the applicants' claims, which are contained in their motion for an order commanding compliance, are in no way involved in the resolution of the pending motion. The Court recognizes, and defendant apparently admits, that the applicants have the right to present their claim that defendant is not complying with the mandates of *Brown I* and *Brown II*. The difference of opinion arises over which vehicle the applicants should utilize to present their claims. Applicants seek to present their claims within the framework of this case. Defendant claims that the claims should be presented in an entirely new lawsuit. This procedural dispute is the only question presented for the Court's consideration at this time.

■ Thus, the issue presented may be simply stated: Should the Court, within its discretion, permit the applicants to assert their claims within the framework of this action? The question, we believe, is a close one. The answer, we hold, is in the affirmative.

## IV. *DISCUSSION*

Defendant opposes the motion to intervene on two grounds. First, defendant claims that there no longer exists any case or controversy sufficient to support the Court's jurisdiction. Second, defendant argues that applicants do not meet the tests for intervention established by F.R.Civ.P. 24. We shall divide our discussion between these two major contentions.

## A. IS THERE A CASE OR CONTROVERSY SUFFICIENT TO SUPPORT THIS COURT'S JURISDICTION?

Defendant asserts that because the claims of all original named plaintiffs in this case are now moot, applicants cannot intervene to keep the action alive because this was never a properly certified class action.

■ As a general rule, consideration of a motion for leave to intervene presupposes the existence of an action into which intervention can be accomplished. *Black v. Central Motor Lines, Inc.,* 500 F.2d 407, 408 (4th Cir. 1974); *Hofheimer v. McIntee,* 179 F.2d 789, 792 (7th Cir.), *cert. denied,* 340 U.S. 817, 71 S.Ct. 47, 95 L.Ed. 600 (1950); *In re V-I-D,* 177 F.2d 234, 236 (7th Cir. 1949), *cert. denied,* 339 U.S. 904, 70 S.Ct. 518, 94 L.Ed. 1333 (1950); *Hartley Pen Co. v. Lindy Pen Co.,* 16 F.R.D. 141, 146 (S.D.Cal.1954) ("A pending suit within federal jurisdiction is by definition prerequisite to intervention.").

■ The parties agree that the original named plaintiffs in this action no longer have a life stake in its continued litigation. Their claims are moot.[5] It is clear that

---

5. Defendant also points out that a case can be mooted by a change in a challenged law, citing *Sanks v. Georgia,* 401 U.S. 144, 91 S.Ct. 593, 27 L.Ed.2d 741 (1971). The law challenged in this action, Section 72–1724, was repealed by the Kansas Legislature effective June 29, 1957.

See 1957 Kan.Session Laws, Ch. 389. However, defendant does not seriously contend that the mandate of *Brown I* and *Brown II* was met by the mere repeal of this offending law. As applicants point out, the "affirmative action to dismantle the dual system is not discharged

mootness deprives a court of jurisdiction. As the Supreme Court noted in its *per curiam* opinion in *DeFunis v. Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 1705–1706, 40 L.Ed.2d 164 (1974):

> The starting point for analysis is the familiar proposition that "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice,* 404 U.S. 244, 246, [92 S.Ct. 402, 404, 30 L.Ed.2d 413] (1971). The inability of the federal judiciary "to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n. 3 [, 84 S.Ct. 391, 394, 11 L.Ed.2d 347] (1964); see also *Powell v. McCormack,* 395 U.S. 486, 496, n. 7 [, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491] (1969); *Sibron v. New York,* 392 U.S. 40, 50 n. 8 [, 88 S.Ct. 1889, 1896, 20 L.Ed.2d 917] (1968).

Although defendant admits that the applicants have a live and concrete interest in the compliance of the Topeka public schools with the mandate of *Brown I* and *Brown II,* it argues that the mootness of the claims of the original named plaintiffs ends the case and blocks intervention. Defendant relies primarily upon a line of cases anchored in the Supreme Court's holding in *Indianapolis School Commissioners v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). In *Jacobs,* plaintiff high school students claimed that defendants had violated the First and Fourteenth Amendments by interfering with a student newspaper. By the time the action reached the Supreme Court, all named plaintiffs had graduated. The Supreme Court dismissed the case as moot after determining that no class had been properly certified or identified. [420 U.S. at 129–130, 95 S.Ct. 848]

Defendant cites numerous post-*Jacobs* cases holding that a Court must dismiss an alleged class action where the individual claim of the class representative has become moot, in the absence of a proper certification of the class. *See Vun Cannon v. Breed,* 565 F.2d 1096, 1098–1099 (9th Cir. 1977); *Inmates v. Sheriff Owens,* 561 F.2d 560, 562 (4th Cir. 1977); *Winokur v. Bell Federal Sav. & Loan Ass'n,* 560 F.2d 271, 276–277 (7th Cir.), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1977); *Lasky v. Quinlan,* 558 F.2d 1133, 1136 (2d Cir. 1977); *Napier v. Gertrude,* 542 F.2d 825, 827 (10th Cir. 1976), *cert. denied,* 429 U.S. 1049, 97 S.Ct. 759, 50 L.Ed.2d 765 (1977).

We do not find defendant's reliance upon the *Jacobs* line of cases to be persuasive. The law is clear that where a class action exists, members of the class may intervene to keep an action alive after the claims of the named plaintiff are rendered moot. In 3B Moore's Federal Practice ¶ 23.90[2], p. 23–548 (1978), we find:

> Where for some reason the original named party may no longer represent the class, e. g., his claim has become moot or he no longer represents the interests of the class, intervention is often permitted in order to allow the action to continue.

*See Rogers v. Paul,* 382 U.S. 198, 199, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); *Goodman v. Schlesinger,* 584 F.2d 1325, 1333 (4th Cir. 1978); *Gaddis v. Wyman,* 304 F.Supp. 713, 715–716 (S.D.N.Y.1969); *Smith v. Josten's Am. Yearbook Co.,* 78 F.R.D. 154, 172 (D.Kan.1978); *Taylor v. Kerr,* 73 F.R.D. 691, 694 (M.D.N.C.1977).

Indeed, it is well known that desegregation cases can involve prolonged litigation. Therefore, the mootness problem caused by the graduation of named plaintiffs is a constant consideration. It has long been recognized that the class action device should be used in desegregation cases for this very reason. *Class Actions: A Study of Group-Interest Litigation,* 1 Race Rel.Rep. 991, 1009 (1956); 20 Univ. of Chi.L.Rev. 577, 578–579 (1953). Thus, in one such

simply by opening the doors of white schools to Negro applicants." *United States v. Choctaw County Board of Education,* 417 F.2d 838, 839 (5th Cir. 1969), quoting *United States v. Jeffer-son County Board of Education,* 372 F.2d 836, 846 (5th Cir. 1966), *cert. denied,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

lengthy siege, *Kelley v. Metropolitan County Bd. of Ed. of Nashville,* 463 F.2d 732, 743 (6th Cir.), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 322, 34 L.Ed.2d 262 (1972), the court noted:

> . . . such a class action as this dealing with continuing constitutional violations does not become moot because of years of delay (much of it attributable to appellants) which occasioned the graduation of the named, original student plaintiffs from the school system before final decision.

Defendant takes the position that this case is not a class action and therefore, as in the *Jacobs* line of cases, there is *no viable* action in which to intervene now that the claims of the named plaintiffs have been mooted. After reviewing the file, the Court cannot accept defendant's conclusion. We find this case to be a class action. This case was filed as a class action; Rule 23 was specifically mentioned in plaintiffs' amended complaint. The Supreme Court in *Brown I* specifically referred to the actions before it as class actions. In *Brown II,* the lower courts were ordered to retain jurisdiction of the cases during the implementation of the mandate of *Brown I* without regard to the possible graduation of named plaintiffs. The legal literature of the time and the legal literature today refers to this case as a class action. *See* Jurow, *School Desegregation, Class Suits, and the Vexing Problem of Group Remedies,* 80 West Va.L.Rev. 25, 26 (1976); 1 Race Rel.Rep., *supra* at 991. This Court is not inclined to tell the Supreme Court that it erred in *Brown I* when it stated "these are class actions." [347 U.S. at 495, 74 S.Ct. 686].

Defendant's second-line position is that even if this case was treated as a class action by the trial court, the Supreme Court, and the legal literature, it was inadequately certified, as was the action in *Jacobs.* Defendant claims that the class was not properly identified and class members would therefore be unable to adequately protect their interests were this case reactivated at this date.

 While we find defendant's position reasonable, we do not believe that it is completely realistic to blindly apply *Jacobs* to an action brought twenty years earlier. It is true that this action was not properly certified pursuant to F.R.Civ.P. 23(c). It is also true that this provision for class certification did not come into existence until the 1966 amendments to Rule 23. 7A C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1785, p. 128 (1972). Lack of certification is therefore not surprising. Defendant correctly points out that the exact definition of the class in this case was never concretely established. However, under the rudimentary class action law existing at the time this action was filed, no such requirement clearly existed. 20 U.Chi.L.Rev., *supra* at 586.

In short, we believe it would be unfair and unrealistic to judge the handling of the class action portion of this case in 1951 by the standards which did not come into existence until nearly fifteen years later. This was intended to be a class action. It was a prototypical class action. From the relief ordered, it seems obvious that the class consisted of Black students attending elementary schools in the Topeka school district. In light of the prospective nature of the relief ordered, it is further obvious that the class definition included future members of the class. To clarify this definition at this time would not prejudice any past members of the class; defendant's claims in this regard are illusory. Proper provision for notice at this time would prevent prejudice to any present and future members of the class.[6]

---

**6.** The parties should give serious consideration, as will the Court, to the question of whether some sort of class action notice might be appropriately sent class members at this time. Entertaining all of applicant's claims will require expansion of the original class definition. The Court stands ready to allow such amendments as will be required to frame applicant's claims for proper resolution. We recall that class actions are an essential part of the judicial arsenal for combating racial discrimination and for that reason courts will respond with flexibility to such claims. *Satterwhite v. City of Greenville,* 578 F.2d 987, 998 (4th Cir. 1978). Post-judgment class certification is not unheard of. *Marshall v. Kirkland,* 602 F.2d 1282, 1301 (8th Cir. 1979).

Even if we were to assume that this was not a proper class action, and we do so for purposes of argument only, we would find unpersuasive defendant's reliance upon the *Jacobs* line of cases. None of defendant's cases, except the 1963 decision in *Becton v. Greene County Board of Education,* 32 F.R.D. 220 (E.D.N.C.1963), involved a situation in which intervenors were attempting to keep the action alive. In *Jacobs* and the cases cited by defendant which have followed it, there were no potential intervenors to keep the action alive. There is a strong line of cases which holds that even if the named plaintiff's claims are moot, a court may, in its discretion, hear claims of intervenors even if it has to treat them as an entirely new lawsuit.

In *Hackner v. Guaranty Trust Co. of New York,* 117 F.2d 95, 98 (2d Cir.), *cert. denied,* 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520 (1941), the case came before the court upon a motion to add a new named plaintiff after it was clear that none of the original plaintiffs had a claim in the jurisdictional amount. The court held that the claims of the new proposed plaintiff, Eastman, could be considered within the context of the existing action:

> This disposes of the case as to all the plaintiffs except Eastman. Since she alleged grounds of suit in the federal court, the only question is whether or not she must begin a new suit again by herself. Defendants' claim that one cannot amend a nonexistent action is purely formal, in the light of the wide and flexible content given to the concept of action under the new rules. Actually she has a claim for relief, an action in that sense; as the Supreme Court has pointed out, there is no particular magic in the way it is instituted. *Chisholm v. Gilmer,* 299 U.S. 99, 57 S.Ct. 65, 81 L.Ed. 458, upholding a suit instituted by mere motion for judgment. . . . Hence, no formidable obstacle to a continuance of the suit appears here, whether the matter is treated as one of amendment or of power of the court to add or substitute parties, Federal Rule 21, or of commencement of a new action by

filing a complaint with the clerk, Rule 3. In any event we think this action can continue with respect to Eastman without the delay and expense of a new suit, which at long last will merely bring the parties to the point where they are now.

This rule of law was applied by our Circuit in *Miller & Miller Auction, Inc. v. G. W. Murphy Indus., Inc.,* 472 F.2d 893, 895–896 (10th Cir. 1973), which was an auctioneer's interpleader action in which the federal government intervened to protect a tax lien. Although the Court held that the main action had to be dismissed as an improper interpleader because plaintiff failed to deposit in the court registry the entire sum in controversy, it nonetheless determined to hear the intervenor's claims:

> Nor does the fact this interpleader action was improperly brought destroy the government's judgment on its counterclaim as an intervenor. A court has discretion to treat pleadings of an intervenor as a separate action to adjudicate claims raised by the intervenor. *See Hackner v. Guaranty Trust Co.,* 117 F.2d 95 (2d Cir. 1941), cert. denied 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520; *Pikor v. Cinerama Prods. Corp.,* 25 F.R.D. 92 (S.D. N.Y.1960); *Truncale v. Universal Pictures Co.,* 76 F.Supp. 465 (S.D.N.Y.1948); 3B Moore, Federal Practice § 24.16[2] at 24–613, 614 (2d ed. 1969); 7A Wright & Miller, Federal Practice & Procedure, Civil § 1917 (1972). The court may properly exercise this discretionary procedure where it appears the intervenor has a separate and independent basis for jurisdiction and in which failure to adjudicate the claim will result only in unnecessary delay.

*See also Healy v. Edwards,* 363 F.Supp. 1110, 1112–1113 (E.D.La.1973); *In re Raabe, Glissman & Co.,* 71 F.Supp. 678, 680 (S.D.N.Y.1947).

This discretionary rule of law has been utilized at least twice to keep alive

non-class action school desegregation cases where it clearly appeared that the claims of the named plaintiffs were not viable. *See Atkins v. State Board of Education of North Carolina,* 418 F.2d 874, 876 (4th Cir. 1969); *Fuller v. Volk,* 351 F.2d 323, 328–329 (3d Cir. 1965). We believe that the general criteria for application of this rule are present in the case at hand. It is clear that the intervenors present their claims in an adversary relationship sufficient to fulfill the "live controversy" requirement. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 755–756, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Therefore, if it is assumed for purposes of argument that this is not a proper class action, we nonetheless decline to apply *Jacobs*[7] and determine to hear the merits of the applicants' claims within the framework of this action *if* the proper criteria for intervention are met. It is to the question of the propriety of intervention that we now turn our attention.

## B. DO APPLICANTS SATISFY THE RULE 24 PREREQUISITES FOR INTERVENTION?

■ Intervention in federal actions is governed by F.R.Civ.P. 24,[8] which provides for four basic types of intervention: statutory intervention of right [24(a)(1)], nonstatutory intervention of right [24(a)(2)], statutory permissive intervention [24(b)(1)], and nonstatutory permissive intervention [24(b)(2)]. · Applicants do not claim any statutory basis for their intervention.

Therefore, we must determine whether there is a proper nonstatutory basis for intervention under either Rule 24(a)(2) or 24(b)(2). Our discussion shall center upon nonstatutory intervention of right.

The criteria for intervention under Rule 24(a)(2) are clearly established:

Intervention of right is required under the rule when: (1) the petitioners assert an interest in the subject matter of the primary litigation; (2) there exists a possibility that the petitioners' interest will be impaired by the final disposition of the litigation; (3) there exists a danger of inadequate protection by the party representing the petitioners' interests; and the petitioners have made timely application to intervene. [*Liddell v. Caldwell,* 546 F.2d 768, 770 (8th Cir. 1976), *cert. denied* 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977)]

*See also United States v. Perry County Bd. of Ed.,* 567 F.2d 277, 278–279 (5th Cir. 1978); *Johnson v. San Francisco Unified School District,* 500 F.2d 349, 356 (9th Cir. 1974); *Fox Hill Surgery Clinic v. City of Overland Park,* No. 77–4120 (D.Kan., 11/9/77, unpublished); 7A Wright & Miller, *supra,* at § 1908, p. 495.

■ The general rule is that intervention is freely allowed. *National Farm Lines v. I. C. C.,* 564 F.2d 381, 384 (10th Cir. 1977); *Greer v. Blum,* 462 F.Supp. 619, 625 (S.D.N.Y.1978); *Assoc. Gen. Contractors of Calif. v. Sec. of Commerce,* 459 F.Supp. 766, 771 (C.D.Cal.1978); *Fox Hill Surgery Clinic v.*

---

7. The latest supplements to the treatises by Moore and Wright & Miller give no indication that *Jacobs* eliminated a court's discretion to hear an intervenor's claim after the claims of the named plaintiff are rendered moot. *See also Health Research Group v. Kennedy,* 82 F.R.D. 21, 30 (D.D.C.1979).

8. Although Rule 24 generally governs intervention, in *Resurrecting Claims through Post-Judgment Appeal of Class Certification Denial,* 64 Iowa L.Rev. 964 n. 3 (1979) it is noted:

Rule 23(c)(2) of the Federal Rules of Civil Procedure might provide a second intervention mechanism for class actions. *Compare* Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I),* 81 Harv.L.Rev.

356, 392 n. 137 (1967) (no intervention procedure implied by rule 23(c)(2), *with* Comment, *The Litigant and the Absentee in Federal Multiparty Practice,* 116 U.Pa.L.Rev. 531, 553 (1968) (rule 23(c)(2) provides separate intervention procedure from that in rule 24). *See also Groves v. Insurance Co. of North America,* 433 F.Supp. 877, 888 (intervention in class actions is governed by both Rules 23 and 24).

The general rule appears to be that to the extent Rule 23 does bear on the intervention question, it should be construed in a manner consistent with Rule 24. 7A C. Wright & A. Miller, *supra* at § 1799, p. 252; 3B Moore's Federal Practice, *supra* at ¶ 23.90[1], p. 23–539.

*City of Overland Park, supra.* This rule of liberal intervention has been emphasized by the courts, including the Tenth Circuit, in school desegregation cases. *Dowell v. Bd. of Ed. of Oklahoma City,* 430 F.2d 865, 868 (10th Cir. 1970); *Atkins v. State Bd. of Ed. of North Carolina, supra,* 418 F.2d at 876.

With these concepts in mind, we turn to a discussion of the specific criteria for non-statutory intervention of right.

### 1. DO APPLICANTS HAVE A PROTECTABLE INTEREST?

The first question to be determined in examining an application for intervention of right is whether the applicants assert an interest in the subject matter of the primary litigation. We do not believe that defendant even bothers to dispute that the applicants have a valid, present, and vital interest in the question of whether the defendant's operation of the Topeka public school system meets the mandates of *Brown I* and *Brown II,* as those decisions have been interpreted and applied by the Supreme Court over the years. In fact, the case law indicates that students and parents have a natural legal interest in seeing that a court's desegregation order is properly carried out. In *Johnson v. San Francisco Unified School District, supra,* 500 F.2d at 353, the court pointed out:

> . . . other courts have recognized that, for purposes of Rule 24(a)(2), all students and parents, whatever their race, have an interest in a sound educational system and in the operation of that system in accordance with the law. [*citing* in n. 5: *United States v. Board of School Commissioners of Indianapolis, Indiana,* 466 F.2d 573, 575 (7th Cir. 1972); *Hatton v. County Board of Education of Maury County, Tennessee,* 422 F.2d 457,

460–461 (6th Cir. 1970); *Atkins v. State Board of Education of North Carolina,* 418 F.2d 874, 876 (4th Cir. 1969); *Moore v. Tangipahoa Parish School Board,* 298 F.Supp. 288, 293 (E.D.La.1969)]

And in *Liddell v. Caldwell, supra,* 546 F.2d at 770, we find this statement:

> We note public interest in the operation of a lawful school system and the fact that students and parents, regardless of race, have standing to challenge a *de jure* segregated school system.

Whether the Court follows the more liberal standard of cases such as *Smuck v. Hobson,* 132 U.S.App.D.C. 372, 408 F.2d 175 (D.C. Cir. 1966), or the less liberal Fifth Circuit view which seldom allows intervention to hinder implementation of a desegregation plan [*see United States v. Perry County Bd. of Ed., supra,* 567 F.2d at 279], it is clear that intervenors who seek proper implementation of a desegregation order have a protectable interest under Rule 24(a)(2).

### 2. DOES THERE EXIST A POSSIBILITY THAT APPLICANTS' INTEREST WILL BE IMPAIRED BY THE FINAL DISPOSITION OF THIS ACTION?

Defendant argues that the requirement of potential impairment of interest cannot be met in this case because applicants could present their interests in another lawsuit should intervention be denied here. However, when such independent lawsuits have been instituted in the past, defendant has taken the position that they should be dismissed in light of the pendency of this action.[9] The Court is not convinced that some derivative of that argument would not be made by defendant were such a separate action filed by intervenors.

---

**9.** In fact, because defendant has previously taken the position that claims such as applicants seek to assert could not be brought in a separate action but must be brought through intervention in this case, applicants ask us to estop defendant from opposing the pending motion on the basis of the doctrine of judicial estoppel. Several factors make such an application of the judicial estoppel doctrine inappropriate in this situation. For example, a normal prerequisite

to application of the doctrine is identity of parties, an element not present here. 28 Am. Jur.2d *Estoppel and Waiver* § 70, p. 698 (1966). Also, the doctrine normally applies only to statements of fact, not legal conclusions. 31 C.J.S. *Estoppel* § 117, p. 613 (1964). Nonetheless, in ruling on the pending motion the Court is making many discretionary decisions and the inequity of allowing defendant to assume inconsistent positions need not be totally ignored.

Clearly the intervenors' interests could be impaired if the defendant came before the Court asking for a declaration of formal compliance with the October 28, 1955 order of the three-judge court. Although defendant claims such compliance, it has never petitioned the Court for such an order. Should such a request be made, the mootness of the original plaintiffs' claims would mean that no party would be before the Court to present applicants' point of view. In such an eventuality, the applicants' interests could be impaired.

Even in the absence of a formal order from the Court, the existence of the October 28, 1955 order's finding of a "good faith beginning" could impair applicants' assertion of their claims in another lawsuit. *See Stallworth v. Monsanto*, 558 F.2d 257, 268 (5th Cir. 1977). Defendant has already made claims of *res judicata* and collateral estoppel within the context of this motion, and we foresee that a collateral estoppel claim might be asserted by the defendant, on the basis of the unamended October 28, 1955 order, were intervenors to bring a separate action. *See Bronson v. Board of Education*, 525 F.2d 344 (6th Cir. 1975), *cert. denied* 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976).

We believe there is a possibility that applicants' interests could be impaired by the final disposition of this litigation.

### 3. DOES THERE EXIST A DANGER OF INADEQUATE PROTECTION BY THE PARTY REPRESENTING THE PETITIONERS' INTERESTS?

This requirement for intervention of right is clearly met and needs little discussion. Because the claims of the original representative plaintiffs are now moot, we have little difficulty determining that no party presently in this case would adequately represent the applicants' interests.

Now that we have concluded that the first three requirements for intervention of right have been met in this case, we turn to a discussion of the final requirement—timeliness.

### 4. IS APPLICANTS' MOTION TIMELY FILED?

The timely filing of a motion for intervention is a prerequisite for leave to intervene under both Rule 24(a) and Rule 24(b). *NAACP v. New York*, 413 U.S. 345, 365, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973); *United States v. Marion County School Dist.*, 590 F.2d 146, 148 (5th Cir. 1979); *Lumbermens Mutual Casualty Co. v. Rhodes*, 403 F.2d 2, 5 (10th Cir. 1968), *cert. denied*, 394 U.S. 965, 89 S.Ct. 1319, 22 L.Ed.2d 567 (1969). However, such a motion is less likely to be denied on timeliness grounds if it is made of right. *See,* Jones, *Litigation Without Representation: The Need for Intervention To Affirm Affirmative Action*, 14 Harv.C.R.–C.L.L.Rev. 31, 78 (1979). The determination as to timeliness is a flexible one and must be made on a case-by-case basis taking into account all the appropriate circumstances. *Stallworth v. Monsanto Co., supra*, 558 F.2d at 263–264; *McClain v. Wagner Elec. Corp.*, 550 F.2d 1115, 1120–1121 (8th Cir. 1977); *Liddell v. Caldwell, supra*, 546 F.2d at 770. The decision is, of course, within the sound discretion of the trial court. *NAACP v. New York, supra*, 413 U.S. at 365, 93 S.Ct. 2591.

Defendant accurately points out that this case has been essentially inactive for 24 years. There is no doubt that it would be highly unusual to allow intervention in a case which has lain dormant so long. Although defendant suggests that the applicants have slept on their rights, the delay that may be attributed to them is not nearly so long a period of time. Applicants are mere school children, some just in elementary school. Many or all of the applicants, no doubt, were not even born when the last order of the court was issued in this case.

Defendant emphasizes that post-judgment intervention is usually frowned upon by the courts. In *McClain v. Wagner Elec. Corp., supra*, 550 F.2d at 1120–1121, it was noted:

> . . . the fact that a judgment has been entered in the case does not necessarily preclude later intervention. *Ne-*

*villes v. EEOC,* 511 F.2d 303 (8th Cir. 1975); *Kozak v. Wells,* 278 F.2d 104, 109 (8th Cir. 1960); *see generally* 7A Wright & Miller, Federal Practice & Procedure, Civil, § 1916. However, there is "considerable reluctance on the part of the courts to allow intervention after the action has gone to judgment and a strong showing will be required of the applicant. Motions for intervention after judgment ordinarily fail to meet this exacting standard and are denied." Wright & Miller, *supra* at pp. 579–80.

Normally, prejudice to the parties is the key factor in determining whether a petition to intervene is timely filed. *McDonald v. E. J. Lavino Co.,* 430 F.2d 1065, 1073 (5th Cir. 1970); *Clanton v. Orleans Parish School Bd.,* 72 F.R.D. 164, 168 (E.D.La.1976); *United States v. International Business Machines Corp.,* 62 F.R.D. 530, 541–542 (S.D.N.Y.1974). Post-judgment interventions are generally disfavored because of the assumption that they will (1) prejudice the rights of existing parties, and (2) interfere with the orderly processes of the court. *Stallworth v. Monsanto, supra,* 558 F.2d at 266; *United States v. United States Steel,* 548 F.2d 1232, 1235 (5th Cir. 1977); *Fox Hill Surgery Clinic v. City of Overland Park, supra.* However, if neither of these factors is evident, there is no strong reason to deny the motion to intervene merely because it is made after judgment has been rendered.

> If neither of these results [(1) prejudice to the rights of the existing parties, or (2) substantial interference with the orderly processes of the court] would occur the mere fact that judgment already has been entered should not by itself require an application for intervention to be denied. Thus although the cases "tend to involve unique situations" and to require "a close examination of all the circumstances of the case," in a significant number of cases intervention has been allowed even after judgment.

We now turn our inquiry to a determination of whether granting the motion to intervene would prejudice the existing parties or disrupt the processes of the court.

*(a) Prejudice to the parties.*

If applicants were allowed to intervene at this late stage of the litigation, the Court cannot conceive of any prejudice that would occur to the original plaintiffs in this action. Defendant claims that it would be prejudiced in two ways. First, defendant claims that the allocation of the burden of proof might be different if applicants were allowed to proceed within the context of this case rather than initiating a new suit. Second, defendant claims that it would be prejudiced by the new issues which applicants seek to place in issue in this suit.

Regarding the burden of proof, the Court is unable at this stage to find any prejudice to defendant for it appears that the applicants will bear the same burden of proof whether they press their claims as intervenors in this action or as named plaintiffs in new litigation. After a general survey of the case law, it appears to the Court that the initial burden of proof will be upon the applicants under either course of action.

In every case across the country, a plaintiff in a segregation suit faces essentially the same burden—to prove that the actions of the defendant school board are not in compliance with the mandates laid down *in this case,* as those mandates have been interpreted and applied by the Supreme Court over the years. Thus, whether applicants proceed in this case or another, the orders originally filed in this case, as interpreted and applied over the years, control.

Under either procedural course of action, applicants will have the burden of proof to show (1) that segregated schooling exists, and (2) that it was brought about or maintained by intentional state action. *Columbus Board of Education v. Penick,* —— U.S. ——, ——, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). This showing must be "satisfactorily established by factual proof and justified by a reasoned statement of legal principles." *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 410, 97 S.Ct. 2766, 2770, 53 L.Ed.2d 851 (1977) *(Dayton I).* Once a plaintiff meets this burden of proof

as to a meaningful portion of a school district the burden shifts to the school board to show that its actions as to other segregated schools within the system were not also motivated by segregative intent. *Keyes v. School District No. 1, Denver, Colo.,* 413 U.S. 189, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

▆ All school systems in the nation which maintained dual schools in 1954 have been under a continuous obligation since that time to establish that dual system. As the Supreme Court stated in *Columbus Board of Education v. Penick, supra:*

. . . both courts below declared that since the decision in *Brown v. Board of Education (II),* 349 U.S. 294 [, 75 S.Ct. 753, 99 L.Ed. 1083] (1955), the Columbus Board has been under a continuous constitutional obligation to disestablish its dual school system and that it has failed to discharge this duty . . . Under the Fourteenth Amendment and the cases that have construed it, the Board's duty to dismantle its dual system cannot be gainsaid.

Where a racially discriminatory school system has been found to exist, *Brown II* imposes the duty on local school boards to "effectuate a transition to a racially non-discriminatory school system." 349 U.S., at 301 [75 S.Ct., at 756]. "*Brown II* was a call for the dismantling of well-entrenched dual systems," and school boards operating such systems were "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board,* 391 U.S. 430, 437–438 [88 S.Ct. 1689, 1694, 20 L.Ed.2d 716] (1968). Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment. *Dayton I,* 433 U.S., at 413–414 [97 S.Ct.,

at 2771, 2772]; *Wright v. Council of City of Emporia,* 407 U.S. 451, 460 [92 S.Ct. 2196, 2202, 33 L.Ed.2d 51] (1972); *United States v. Scotland Neck City Board of Education,* 407 U.S. 484 [92 S.Ct. 2214, 33 L.Ed.2d 75] (creation of a new school district in a city that had operated a dual school system but was not yet the subject of court-ordered desegregation).

*See also Dayton Board of Education v. Brinkman,* —— U.S. ——, ——, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) *(Dayton II); United States v. U.S.D. # 500,* 610 F.2d 688 (10th Cir.1979).

▆ Defendant's counsel suggested in oral argument that although a constitutional violation has already been established in this case, were a new suit instituted the applicants would have the burden to prove that Topeka had a dual school system in 1954. The Court, we believe, may take judicial notice of the fact of the dual school system in 1954. F.R.E. 201. Defendant's position would not be aided in this regard by forcing applicants to file a new suit. Whether in this action or another, applicants have the initial burden to show that the mandate of *Brown I* and *Brown II* has not been met. If they show segregation in fact, then the burden will shift to the school board under either proposed action.[10]

The second aspect of defendant's claim of prejudice regards the injection of new issues into the action. As originally filed, this case involved only Topeka's elementary schools, which were segregated by law. Junior and senior high schools were not segregated by law in Topeka in 1951 and therefore were not a part of this action. The present applicants seek to expand the scope of the Court's inquiry to include junior and senior high schools. The applicants also ask the Court to look at the equality of facilities between schools in *U.S.D. # 501* that are predominantly attended by White

10. Justice Stewart's dissent in the *Columbus Board of Education v. Penick* case suggests that the majority has placed too much reliance on the state of the school system in 1954. Justice Rehnquist's dissent also pointed out that there may come a point in time where the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of *de jure* segregation justifying judicial intervention, quoting the *Keyes* case, 413 U.S. at 211, 93 S.Ct. 2686.

students and those that are predominantly attended by Black students. Defendant claims that the original trial court order in this case found in favor of defendant on the equality of facilities issue and that the issue cannot be inquired into again. Finally, the applicants seek to litigate the legality of policies such as the newly-adopted "open enrollment" plan, which were not in existence in 1951 or 1955.

We observe initially that it is impossible for defendant to claim prejudice from the injection of new issues into this action when defendant's announced position is that applicants are free to pursue each and every one of those claims in a separate action.

Further, we note that in light of the wording of the October 28, 1955 order of the trial court and the fact that no order of compliance has ever been issued, this action, although dormant, has been technically open for the past 24 years. When, as here, a court retains jurisdiction over a school desegregation case in order to enforce its orders, changes in the law must be applied as they occur. *United States v. Board of Ed. of Valdosta, Ga.,* 576 F.2d 37, 38 (5th Cir. 1978); *United States v. South Park Independent School Dist.,* 566 F.2d 1221, 1225 (5th Cir. 1978). Had the case been actively supervised by the Court since 1955, all of these supposedly new issues would have been matters for the Court's scrutiny in a determination of whether the direct mandate of *Brown II* had been met.

As we noted earlier, the Supreme Court held in *Keyes* that where a plaintiff shows purposeful segregation in a meaningful portion of a school district, the burden shifts to the school board to prove that segregation of other schools in the district was not purposeful. This shifting of the burden of proof is based upon three presumptions: (1) segregation in one area is presumed to have a reciprocal effect in contiguous zones; (2) segregation of a particular school is presumed to have a "magnet" effect on the racial composition of the

surrounding residential neighborhood; and (3) intent to segregate part of a school system is probative of intent to segregate other parts of the same system. *Keyes v. School District No. 1, Denver Colo., supra,* 413 U.S. at 201–207, 93 S.Ct. 2686; *see* Kanner, *From Denver to Dayton: The Development of a Theory of Equal Protection Remedies,* 72 NW.U.L.Rev. 382, 386–387 (1977).

Topeka intentionally segregated elementary schools in 1951. Elementary schools constitute a meaningful portion of the school district.[11] The *Keyes* presumptions, in light of Topeka's use of a "feeder" school system, provide a basis for finding that segregation in junior high and high schools, if any, is purposeful. Thus, continued supervision of the Topeka schools under the decree in *Brown II* would naturally have led the Court over the years to turn its attention to the possibility of segregation in the junior and senior high schools, and now to the middle schools which are being adopted in Topeka.

This fact was recognized in the *Weinberger* case by the defendant which argued that the *school system* was under court supervision in opposition to the government's position that an HEW investigation of the entire system was not barred because this case, as originally filed, involved only elementary schools.

Regarding equality of facilities, we find this is a factor which the Court must examine in determining whether the mandate of *Brown II* has been met, whether or not that examination occurs within or without the context of this case. As the Supreme Court noted in *Columbus Board of Education v. Penick, supra:*

> In determining whether a dual school system has been disestablished, *Swann [v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554] also mandates that matters aside from student assignments must be considered.

---

11. Normally, the *Keyes* presumptions are applied in a geographic context. We believe they apply just as well in determining whether purposeful segregation of elementary schools affects the racial composition of junior and senior high schools.

"[W]here it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." 402 U.S., at 18, 91 S.Ct., at 1277.

We do not think defendant can realistically contend that because the trial court found equality of facilities in 1951, the issue would have been closed to review by the court following the *Brown II* remand.[12] More pertinently, defendant cannot claim the 1951 finding would be a basis for *res judicata* or even collateral estoppel were a separate action filed by applicants now. *See* Note, *Subsequent Developments in the Law and the Applications of Collateral Estoppel in School Desegregation Cases,* 7 Toledo L.Rev. 683 (1976).

■ In looking at the issue of prejudice, we turn to defendant's final point which is that applicants' attempt to challenge present plans and policies of the board, such as the open enrollment policy and the long range facilities plan, would unduly prejudice defendant. This claim is answered by the fact that had the Court's retention of jurisdiction since 1955 been an active one, these matters would have come before the Court's direct scrutiny because a court which has retained jurisdiction to enforce a desegregation order must take into account changed circumstances. *Mapp v. Board of Education of Chattanooga,* 477 F.2d 851, 852 (6th Cir.), *cert. denied* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973); *Kelley v. Metropolitan Bd. of Ed. of Nashville, supra,* 463 F.2d at 745–746. Thus, it is a court's obligation to monitor actions taken after rendition of judgment which may increase segregation in the school system. *See Davis v. East Baton Rouge Parish School Board,* 570 F.2d 1260, 1263 (5th Cir. 1978), *cert. denied* 439 U.S. 1114, 99 S.Ct. 1016, 59

L.Ed.2d 72 (1979); *Steele v. Board of Public Instruction of Leon County,* 371 F.2d 395, 397 (5th Cir. 1967).

In summary, had the Court's retention of jurisdiction remained active or were applicants to file a new action, all the matters which lead the defendant to claim prejudice would have or would soon come within the Court's scrutiny. Therefore, we find that no substantial prejudice would accrue to defendant were applicants allowed to press their claims as intervenors in this action rather than as plaintiffs in a separate action. We turn now to examination of the second matter of concern in post-judgment intervention cases—interference with the orderly processes of the Court.

(b) *Interference with the orderly processes of the Court.*

In determining whether post-judgment intervention would substantially disrupt the orderly process of the Court, we think it important to recall once again the wording of the October 28, 1955 order of the three-judge court:

Jurisdiction of the cause for the purpose of entering the final decree is retained until such time as the Court feels there has been full compliance with the mandate of the Supreme Court. [139 F.Supp. at 470]

This retention of jurisdiction, it should further be remembered, was explicitly ordered by the Supreme Court in *Brown II* when it stated: "[d]uring this period of transition, the courts will retain jurisdiction of these cases."

The retention of jurisdiction is not an unusual procedure. In 46 Am.Jur.2d *Judgments* § 230, p. 463 (1969) it is stated that parties to an action "are regarded as still in court after the rendition of a judgment, for the purpose of giving effect thereto." And in 10 C. Wright & A. Miller, *supra* at § 2651, p. 14 it is noted that a "court may enter a final and appealable judgment and still retain jurisdiction over the action so as to make sure its order is applied correctly."

---

12. Surely defendant does not contend that after receiving the favorable ruling on equality of separate schools in 1951 it could have avoided court review under *Brown II* while engaging in "backsliding" by neglecting facilities in schools attended predominantly by minority students.

The reasons why retention of jurisdiction may be required in desegregation cases are not difficult to fathom:

> Prophylactic relief is particularly important in desegregation cases, in which resistance and evasion have proven all too common, often delaying any meaningful relief until years after the court's finding of a constitutional violation. The advent of desegregation has opened new opportunities for discrimination: segregatory tracking and other discrimination within a school does not become possible until both black and white students are attending. Courts should learn from these past unhappy experiences and avoid their reiteration.

> . . . . .

> . . . the court itself should retain jurisdiction and adjudicate claims of new or continuing discrimination. [Leubsdorf, *Completing the Desegregation Remedy*, 57 B.U.L.Rev. 39, 55–56 (1977)]

██ For these reasons, the Supreme Court continues to emphasize the need for retention of jurisdiction by district courts in desegregation cases. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 21, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. County School Board,* 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Jurisdiction should be retained until the court can determine that there has been full compliance with the Constitution, and until such a finding is made the case remains "active" under the court's jurisdiction. *U. S. v. South Park Independent School District, supra,* 566 F.2d at 1225.[13]

Thus, it has been stated that "[a]lthough in other litigation the court's decision virtually marks the end of the case, in a school desegregation action it is scarcely the beginning." Leubsdorf, *supra,* 57 B.U.L.Rev. at 64. As the Fifth Circuit recently recognized:

> . . . the district court has a continuing responsibility to appraise the system in the light of actual conditions and experience and make required changes to assure the maintenance of a unitary system. *Lee v. Macon County Board of Education,* 584 F.2d 78 (5th Cir. 1978) makes clear that in the absence of a final judgment or dismissal of the case subject matter jurisdiction is retained . . . [*Pate v. Dade County School Board,* 588 F.2d 501, 504 (5th Cir. 1979)].

*See also Lee v. Macon County Bd. of Ed.,* 584 F.2d 78, 82 (5th Cir. 1978); *Pickens v. Okolona Municipal Separate Sch. Dist.,* 594 F.2d 433, 436 (5th Cir. 1979).

In this case we have no final order, no order of dismissal, and no finding of compliance with the unitary school concept. Thus, this case has never been officially closed. It is true that the action has remained open an exceptionally long time, but such a circumstance is not unknown in school desegregation litigation.[14] Given this state of affairs, the proper method of presenting a claim such as applicants assert, it appears, is through intervention in this action. A strong line of Fifth Circuit cases [15] supports this intervention procedure.

In *Hines v. Rapides Parish School Board,* 479 F.2d 762 (5th Cir. 1973), the district

---

**13.** There are no established criteria now in existence to guide a district court as to precisely when it should relinquish its retained jurisdiction in a school desegregation case. However, some helpful suggestions are contained in Comment, *Retention of Jurisdiction in Desegregation Cases: A Causal and Attitudinal Analysis,* 52 So.Cal.L.Rev. 195, 228–230 (1978). *See also Bradley v. Milliken,* 476 F.Supp. 257 (E.D.Mich. 1979); *Martin v. Charlotte-Mecklenburg Bd. of Ed.,* 475 F.Supp. 1318 (W.D.N.C.1979).

**14.** In 1978, the Fifth Circuit's opinion in *Davis v. East Baton Rouge Parish Sch. Bd., supra,* 570 F.2d at 1260, noted that the suit had been instituted some 22 years earlier in 1956. In

*Davis v. Bd. of School Com'rs of Mobile County, supra,* 517 F.2d at 1046, it is indicated that the action had been in litigation for some 12 years, since 1963. The Sixth Circuit noted in *Kelley v. Metropolitan County Bd. of Ed. of Nashville, supra,* 463 F.2d at 734 that the action had been through "17 years of continuous litigation."

**15.** A survey of the case law indicates to this Court that the Fifth Circuit is the single court most experienced in dealing with the problems attendant to attempts to carry out desegregation orders. That experience is one of the reasons we find this line of cases persuasive.

court dismissed a class action brought by parents who alleged that a unitary school system envisioned by the court's desegregation order in a previous case had not been achieved. The Fifth Circuit agreed that the proper course of action was dismissal with leave to intervene in the case that had been reduced to judgment:

. . . we feel that the proper course for parental groups seeking to question current deficiencies in the implementation of desegregation orders is for the group to petition the district court to allow it to intervene in the prior action. The petition for intervention would bring to the attention of the district court the precise issues which the new group sought to represent and the ways in which the goal of a unitary system had allegedly been frustrated. The district court could then determine whether these matters had been previously raised and resolved and/or whether the issues sought to be presented by the new group were currently known to the court and parties in the initial suit. If the court determined that the issues these new plaintiffs sought to present had been previously determined or if it found that the parties in the original action were aware of these issues and completely competent to represent the interests of the new group, it could deny intervention. If the court felt that the new group had a significant claim which it could best represent, intervention would be allowed. [479 F.2d at 765]

In *Spangler v. Pasadena City Board of Ed.,* 552. F.2d 1326, 1328–1329 (9th Cir. 1977), the Ninth Circuit adopted the view that the proper method of challenging a school board's compliance with a desegregation order is through intervention into the pending case rather than the filing of a new action. *See also Pate v. Dade County School Bd., supra,* 588 F.2d at 503–504; *Davis v. East Baton Rouge Parish School Bd., supra,* 570 F.2d at 1260; *Davis v. Bd. of School Com'rs of Mobile County,* 517 F.2d 1044, 1046–1047, 1049 (5th Cir. 1975) *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *Calhoun v. Cook,* 487

F.2d 680, 682 (5th Cir. 1973); *Lee v. Macon County Bd. of Ed.,* 482 F.2d 1253, 1254 (5th Cir. 1973); *Givhan v. Bd. of Ed. of Western Line Consol. Sch. Dist.,* 363 F.Supp. 714, 716 (N.D.Miss.1973); *Strange v. Bd. of Ed. of Greenville,* 70 F.R.D. 465, 466 (N.D.Miss. 1975).

It is precisely this line of cases that defendant relied upon in moving to dismiss the *Johnson v. Whittier* case. As pointed out earlier in this opinion, in both *Johnson v. Whittier* and *U.S.D. # 501 v. Weinberger,* defendant contended that this action was open and available for the presentation of all claims that the mandates of *Brown I* and *Brown II* were not being followed. As also pointed out earlier, Judge Templar accepted, at least partially, defendant's position in both those cases. *See Johnson v. Whittier,* T–5430 (D.Kan., 10/9/75, unpublished); and *U.S.D. # 501 v. Weinberger,* No. 74–160–C5 (D.Kan., 3/23/74, unpublished). We read both these opinions as strongly implying that the proper course of action for a party seeking to present desegregation claims is intervention of the very type now proposed by applicants. We call particular attention to the following passages from the *Weinberger* opinion:

Under the circumstances, this Court is bound to hold that indeed a judgment was rendered [in *Brown v. Board of Education, supra,* 139 F.Supp. at 470] and that it remains in full force and effect. The Court must further determine that the proviso in 42 U.S.C. 2000d–5 applies here and that the Court has retained jurisdiction authorizing it to make a further determination as to whether there has been full compliance with the mandate of the Supreme Court. This Court has always been open and available to any party having an interest to demonstrate that the mandate of the Supreme Court has or has not been fully complied with. Until now, no party has submitted any facts or evidence one way or the other.

This Court invites and requests all defendants to present and submit to this

Court any facts or evidence they have which should be considered in now determining whether the mandate of the Supreme Court and all other obligations and requirements of law have been complied with. This Court is open and available to hear any charges or claims that legal requirements have not been met by the School District as it relates to racial discrimination condemned in *Brown v. School Board.*

█ It appears that intervention by applicants would not disrupt the orderly processes of the Court. In fact, the case law is strong that intervention of this type is precisely the proper manner in which to assert a claim of the type applicants seek to present. The general reasons for holding post-judgment intervention in disfavor are clearly inapplicable in a school desegregation situation where the proposed intervenors seek to encourage compliance with the Supreme Court's rulings.

█ We determine that applicants may intervene pursuant to F.R.Civ.P. 24(a)(2).[16]

## V. *CONCLUSION*

In concluding this opinion, we emphasize once again that the merits of applicants' claims are not presented for decision at this time. This order is addressed to the purely procedural question of whether applicants should be allowed to intervene in this action or should be required to initiate a separate action. For all the reasons explained herein, the Court has determined to exercise its discretion in favor of granting the motion to intervene. The judges of this court and the defendant have invited intervention of this type. In the usual case, such intervention is clearly the proper method for assert-

ing a claim that a school board under court order to desegregate is not complying with the law as interpreted by the Supreme Court. It is true that granting intervention in a case which has lain dormant for 24 years is an extraordinary measure. However, we do not believe it can be gainsaid that this is an extraordinary case presenting extraordinary circumstances. After weighing all of those circumstances, the Court concludes the motion to intervene should be sustained.

The Court now refers this action to Magistrate Crow so that pretrial proceedings, including discovery, may be initiated immediately and prosecuted vigorously. We stand prepared to make whatever rulings are necessary to place this case in a posture for early trial. If we find that U.S.D. # 501 is in full compliance with all constitutional requirements, we intend to enter an order of compliance and close the case so that questions such as we have just resolved are not presented to another judge 24 years from now. If we find that U.S.D. # 501 is not in full compliance with all constitutional requirements, we intend to enter and enforce the orders necessary to obtain such compliance and then close the case.

We commend the parties for the fine presentation of the pending motion. We urge the parties to cooperate in matters of discovery so that this case can be ready for trial in the near future.

IT IS THEREFORE ORDERED that the motion to intervene as named plaintiffs be, and is hereby, granted.

---

16. Even if applicants were not entitled to intervene of right, we would hold, in our discretion, that they should be allowed permissive intervention under Rule 24(b)(2). Permissive intervention is discretionary with the Court. *Shump v. Balka,* 574 F.2d 1341, 1345 (10th Cir. 1978); *Montgomery v. Rumsfeld,* 572 F.2d 250, 255 (9th Cir. 1978). It does not require that the intervenor's claim involve facts identical to those being litigated, but can be supported by a common question of law, which is clearly present here. *Swift v. Toia,* 450 F.Supp. 983, 990 (S.D.N.Y.1978) *aff'd* 598 F.2d 312 (2d Cir. 1979); *Davis v. Smith,* 431 F.Supp. 1206, 1209 (S.D.N.Y.1977). Because defendant cannot be prejudiced by the intervention in light of the applicants' conceded right to assert their claims in another action, we find strong grounds for granting permissive intervention.