**Lydia LEWIS, et alia, Plaintiff,**

**v.**

**George GROSS, individually and as Commissioner of the New York City Department of Social Services, et alia, Defendants.**

**No. CV–79–1740.**

United States District Court,
E.D. New York.

July 14, 1986.

Main Street Legal Services by Janet M. Calvo, Bayside, N.Y., and Washington Square Legal Services, Inc. by Lynn M. Kelly, and Legal Aid Soc. by Arthur J. Fried, New York City, for plaintiffs.

Peter Zimroth, Corp. Counsel of the City of New York by Michael Young, New York City, for City defendants.

Robert Abrams, Atty. Gen. of the State of N.Y. by Marion Buchbinder, New York City, for State defendants.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Charles Kleinberg, Brooklyn, N.Y., for Federal defendants.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

This class action is brought by Lydia Lewis and eight other named class representatives against the defendants, seeking a permanent injunction and declaratory judgment authorizing the payment of Medicaid benefits to "non-legal permanent resident" ("non-LPR") aliens in New York State. The matter is before the Court on the following motions: (1) the federal government's motion to decertify the class under Rule 23 of the Federal Rules of Civil Procedure, (2) plaintiff's motion to amend the complaint and modify the class definition, and (3) the motion of five aliens to intervene pursuant to Rule 24(b)(2) and be designated additional class representatives.

### Class Decertification and Modification Motions

The plaintiff class in this case is drawn from a pool of individuals who live in New York State and who are colloquially referred to as "illegal aliens." More accurately, these individuals are those who have not been granted legal permanent resident status, i.e., they have no "green card," granted according to the standards of the Immigration and Naturalization Service ("INS"), although they have, for all practical purposes, established permanent residence in this country. According to the 1980 census, the number of such non-LPR aliens in New York State is estimated at 234,000. Although the majority of non-LPR aliens nationwide are said to have originally come from Mexico, those living in New York State are said to come from many different parts of the world. According to plaintiffs, most of them now live in New York City. Plaintiffs offer an astounding general description of the group's immigration statuses. Over 77% of the New York State non-LPR aliens counted in the 1980 census had been in the country for more than five years and over 44% had been here for more than ten years. In addition, unlike those in the southern or western parts of the country, the non-LPR aliens in New York State are said to be more likely to be persons who entered with visas and were therefore inspected by INS before entering the United States. Many non-LPR aliens are said to be employed as food processors, dishwashers, hospital aids and in other occupations involved in delivery or handling of food. The non-LPR alien population is generally comprised of young adults under 35 years old. Many non-LPR aliens in New York have close U.S. citizen or legal permanent resident relatives including spouses, children, siblings, and parents and many are in the process of applying for legal permanent resident status.

Nine New York non-LPR aliens supposedly in need of medical care and Medicaid assistance brought the instant action. They were originally certified by the court as a plaintiff class on January 16, 1981, (Weinstein, Ch.J.) as "all aliens residing in the State of New York who have been denied Medicaid on the basis of their alienage." By order of October 15, 1981, the class definition was modified to add the requirement that the aliens qualifying for the class be living in New York "under color of law." The class was thus redefined to include "all aliens residing in New York State under color of law who have applied or attempted to apply for Medicaid benefits." Presumably, this definition also carried over from the previous class definition the requirement that plaintiffs "have been denied Medicaid on the basis of their alienage." This requirement, however, should be coordinated with the expansion of the definition to include not only actual Medicaid applicants but also those who "have attempted to apply" and who "have been or would be denied Medicaid on the basis of their alienage." Thus, the full class definition would include "all aliens residing in New York State under color of law who have applied or attempted to apply for Medicaid but have been or would be

denied Medicaid on the basis of their alien- age."

Plaintiffs claim that they consented to the 1981 modification of the class definition to include the "under color of law" require- ment because of their "initial misreading" of the new amendments to the Medicaid statute enacted in the Omnibus Budget Reconciliation Act, Pub.L. No. 87–35. They now seek to amend the class defini- tion to delete this under color of law re- quirement. None of the defendants has opposed the motion, but the federal defend- ant has instead filed the instant motion to narrow the class definition or decertify the class altogether pursuant to Rule 23(c)(1).

The Secretary first argues for decertifi- cation because the minimum requirements for the maintenance of the suit as a class action have not been satisfied, as set forth in Rule 23(a) of the Federal Rules of Civil Procedure. The Secretary appears to be arguing that the first three of these re- quirements, numerosity of class members, commonality, and typicality of claims, have not been satisfied. An examination of the claims of the named plaintiffs and those of the named class, however, suggests other- wise.

According to the Secretary, the claims of the named plaintiffs are not typical of and do not raise issues of law or fact common to the class because there are numerous types of immigration status that are not represented among the named plaintiffs. Specifically, no named plaintiff has filed for an application for permanent resident status at a U.S. consular office abroad, had approved an application for permanent resi- dent status at a U.S. consular office abroad, applied for an adjustment of sta- tus, been granted an adjustment of status, is eligible for "registry" status because of continuous residence in the United States since before June 30, 1948, received de- ferred action status, resided in the United States under an INS order of supervision, resided in the United States under an INS

grant of voluntary departure, had a visa extended for medical reasons, had a private bill introduced on his behalf in Congress, had a private bill passed on his or her behalf in Congress, been paroled into the United States, been admitted as a "condi- tional entrant" into the United States, been granted refugee status, applied for asylum, been granted asylum, applied for withhold- ing of deportation pursuant to 8 U.S.C. § 1253(h), been granted withholding of de- portation pursuant to 18 U.S.C. § 1253(h), been allowed to remain in the United States as a "Cuban/Haitian entrant (status pend- ing)," or is a child. Therefore, the argu- ment continues, the named plaintiffs' claims are neither typical of nor common to those of non-LPR aliens in these categories of status under our immigration laws.

■ Even assuming the accuracy of the Secretary's list of unrepresented categories of immigration status,[1] the Secretary's ar- guments fail because none of the Rule 23(a)(2) prerequisites has been interpreted with the narrowness suggested by the Sec- retary's argument. The commonality re- quirement, for example, merely states that there must be "questions of law or fact common to the class," Rule 23(a)(2), and a single issue common to all class members is sufficient to satisfy the requirement. In *McCoy v. Ithaca Housing Authority*, 559 F.Supp. 1351, 1355 (N.D.N.Y.1983), the court stated that "it is clear that not all questions of law and fact among the puta- tive class must be identical. According to Newburg, '[t]he (a)(2) prerequisite requires only a single issue common to the class.' 1 H. Newburg, § 1110f at 184." The named plaintiffs in the instant case clearly raise more than one significant issue of law com- mon to the whole class: for example (1) whether the Medicaid statute authorizes the alienage restriction imposed by the Sec- retary's regulation, (2) whether the alien- age restriction violates the U.S. Constitu- tion, and (3) what is the proper interpreta- tion of the alienage requirement "perma-

---

**1.** The Secretary's list, however, appears some- what inaccurate. One of the named plaintiffs, Wilson Flores, now deceased, was a child, and another, Yoshi Nakanishi, received three visa

extensions. In addition, some of the proposed intervenors fit into other INS designations listed by the Secretary.

nently residing under color of law." Thus, the commonality requirement is satisfied.

■ The Rule 23(a)(3) prerequisite of typicality assures that the named representatives' claim raises these common questions on behalf of the class. *Zeffiro v. First Pennsylvania Banking and Trust Company,* 96 F.R.D. 567, 569 (E.D.Pa. 1983). A named plaintiff's claim is "typical" within the meaning of the rule if it arises from the same course of conduct that gives rise to the claims of other class members and is based on the same legal theory and if his interests are not antagonistic to those of the class. *In re Alcoholic Beverages Litigation,* 95 F.R.D. 321, 324 (E.D.N.Y.1982). Most importantly, the Court there noted:

"There has been general agreement that the existence of varying fact patterns to support the claims of individual class members does not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory. Since the claims here are based on what appears to be the identical theory and since there are no demonstrated antagonistic interests between the representative parties and the class members, the typicality requirement is satisfied."

*Id.* at 324 (citations omitted), *see Calkins v. Blum,* 511 F.Supp. 1073 (N.D.N.Y.1981), *aff'd, remanded,* 675 F.2d 44 (2d Cir.1982).

■ The claims of the named plaintiffs and the class in the present case both rest on identical legal theories. All nine named plaintiffs and class members were at some time non-LPR aliens unable to pay for necessary medical care but ineligible for Medicaid under the Secretary's regulation. They all base their claim for benefits on the three legal arguments listed above, which supposedly demonstrate the invalidity of the Secretary's alienage restriction.

For purposes of the typicality requirement, it is not significant that the named plaintiffs and some class members may have differing immigration status, since all plaintiffs allege that their INS designation improperly prevented their receiving Medicaid. Under the plaintiffs' first two arguments against the alienage restriction,

that it violates the Medicaid statute and the federal constitution, their immigration statuses are irrelevant because they argue that alienage can never ban Medicaid coverage. Under plaintiffs' third argument, that the Secretary's interpretation of the "permanently residing under color of law" requirement is arbitrary and capricious, their differing immigration status is also unimportant because plaintiffs all claim that under established precedents the meaning of the phrase is expansive and elastic enough to include them all. Plaintiffs will not face disagreements on which immigration designations fit within the meaning of "under color of law." Rather, they all claim that case law has established that aliens residing under color of law are those residing in New York on a continuing basis with the knowledge and acquiescence of INS.

Furthermore, plaintiffs argue convincingly that "the fact that aliens are eligible for multiple alien statuses but apply for those statuses serially gives all aliens an interest in having many alien statuses established as examples of permanently residing under color of law for Medicaid eligibility." Plaintiffs illustrate the argument with the example of Lydia Lewis:

"Lydia Lewis' total situation makes her eligible for multiple immigration statuses. She entered the U.S. as a child sixteen years ago. She is the wife of a U.S. citizen, the mother of three U.S. citizens, and the daughter of a U.S. citizen. She is eligible for preferential relative status as her husband's wife and her mother's daughter. Her relative petition has been approved and she is eligible for and an applicant for adjustment of status. As such, she is eligible for voluntary departure. As an alien living in the U.S. for more than seven years with dependent citizen children, a citizen spouse and mother, she is a prime candidate for suspension of deportation. She has been granted employment authorization. Her length of residence and close relationship with U.S. citizens makes her a candidate for deferred action or a lengthy stay of deportation, which can be transferred

into an order of supervision. Her eligibility for these statuses gives her a direct interest in having them established as examples of statuses which satisfy Medicaid eligibility requirements. Clearly, her interests are not antagonistic to having these and other statuses established as examples of permanently residing in the U.S. under color of law."

Thus, because the named plaintiffs and the class members all rely on "identical theor[ies]" and "there are no demonstrated antagonistic interests" between them, *In re Alcoholic Beverages Litigation, supra,* 95 F.R.D. at 324, the typicality requirement is satisfied.

The federal defendant also argues that the numerosity requirement has not been satisfied. It argues primarily that the census report upon which plaintiffs rely addresses only the question of how many non-LPR aliens without current visas presently live in New York. But it does not show anything, defendant argues, with respect to the class, i.e., aliens permanently residing in New York under color of law who have applied or have attempted to apply for Medicaid. Thus, the report fails to show, as Rule 23(a)(3) requires, that plaintiffs are so numerous that joinder is impractical.

■ Again the federal defendant cites no cases supporting its strict view of the numerosity requirement. It has been long recognized that there is no specific number of class members necessary to sustain a class action, *Cypress v. Newport News General and Nonsectarian Hospital Ass'n,* 375 F.2d 648 (4th Cir.1967); *Stoner v. Miller,* 377 F.Supp. 177 (E.D.N.Y.1974), and no precise count of the number of class members is required. In determining whether the numerosity requirement is met, the Court may consider reasonable inferences drawn from the facts. *Senter v. General Motors Corp.,* 532 F.2d 511, 523 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 60 L.Ed.2d 150 (1976). Reliance upon such inferences is particularly appropriate when the information about the exact numbers is within the defendant's control. *Folsam v. Blum,* 87 F.R.D. 443 (S.D.N.Y.1980).

■ In the present case plaintiffs allege that they attempted through discovery to get from defendant the number of New York aliens denied Medicaid on the basis of their alien status, but their efforts were unsuccessful. Because such information is within the control of some of the government defendants and not readily accessible to plaintiffs, resort to inferential reasoning is particularly appropriate here.

Plaintiffs computed their estimate of the size of the class by looking first at the number of New York State residents already receiving Medicaid. According to the 1979–80 report of the New York State Department of Social Services, 1,322,352 people, or 7% of the 17,558,072 residents of the State of New York, already receive Medicaid. If this 7% figure is applied to the estimated 234,000 total number of non-LPR aliens in New York, then the class would number approximately 16,380. Even if a more conservative percentage, such as 1% were used as an estimate of the proportion of non-LPR aliens who have been or would be denied Medicaid solely on the basis of their alienage, the class would number in the thousands, i.e., 2,340 individuals. These reasonable estimates clearly indicate that the plaintiff class is so large that joinder would be impractical.

■ In addition, it should be noted that, by seeking prospective injunctive relief, plaintiffs' action will also involve future class members. Other cases have found that in such situations persons who might be injured in the future are includable in the class. *Dixon v. Heckler,* 589 F.Supp. 1494, 1511 (S.D.N.Y.1984); *Brun v. Bd. of Ed.,* 84 F.R.D. 383 (D.Kan.1979). Thus, non-LPR aliens in New York who suffer in the future from their alleged ineligibility for Medicaid will be added to the ranks of the plaintiff class. On these facts, then, it can be inferred that the number of potential plaintiffs is great enough to make joinder impractical, and the numerosity requirement, like the other prerequisites of Rule 23(a), is satisfied.

**1170**

■ Because all of the Secretary's other arguments pertain to an alleged need to narrow the class definition, rather than a need to decertify the class altogether, these other arguments will be considered with plaintiffs' arguments for amending the class definition. The present class satisfies the prerequisites of Rule 23(a), and the Secretary's motion to decertify is denied.[2]

Both the Secretary and the plaintiffs seek to modify the class definition. As an alternative to an order decertifying the class, the Secretary proposes that its definition be narrowed significantly. Plaintiffs on the other hand have moved pursuant to Rule 15 to amend the complaint so as to broaden the class definition by deleting the "under color of law" requirement that it now includes.

The plaintiffs' proposed amended complaint would make two modifications: first, it would add the proposed intervenors as named class representatives, and second, it would delete from the class definition the "under color of law" requirement so that the proposed new class would include "all aliens residing in New York State who have been or will be denied Medicaid because of defendant's restrictions on alien eligibility."

The Supreme Court has established that amendment of the complaint pursuant to Rule 15 is to be liberally granted and that "this mandate is to be heeded." *Fonian v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 231, 9 L.Ed.2d 222 (1962); *see S.S. Silberblatt Inc. v. East Harlem Pilot Block Building Housing Development Fund Co., Inc.*, 608 F.2d 28 (2d Cir.1979). In this case, this policy comports with Rule 23(c) which provides for the altering or amending of the class definition before a decision on the merits.

■ Plaintiffs correctly assert that amendment is particularly appropriate here so as to make the complaint and the class definition comport with the proof presented and the claims alleged. Under the current class definition, only those aliens residing

in New York "under color of law" would be included; obviously, non-LPR aliens not residing in the state under color of law, i.e., "illegal aliens," would not fit within this description.

In the instant litigation, however, plaintiffs seek to challenge not only the Secretary's interpretation of the "under color of law" requirement now included in its Medicaid regulation, but also the inclusion of any alienage restrictions whatsoever. In fact, two of the theories advanced by plaintiffs, both their statutory and constitutional arguments, assert that it is impermissible for the Secretary to consider alien status at all in determining aliens who would be entitled to benefits if plaintiffs prevail with respect to these latter two arguments "under color of law" requirement. In order to open the class to non-LPR or "illegal" aliens who are the intended beneficiaries of the plaintiffs' statutory and constitutional arguments against the inclusion of any alienage restriction at all, the "under color of law" requirement must be dropped from the class definition. Because leave to amend the complaint is appropriate to make it comport with the claims that plaintiffs seek to advance, plaintiffs' motion is granted so as to delete the "under color of law" requirement from the class definition.

It should be noted that, apart from the under color of law requirement, plaintiffs' proposed definition differs from the current definition in one other respect. Most importantly, plaintiffs' definition excludes the requirement that plaintiffs "have applied or attempted to apply for Medicaid." However, plaintiffs have failed to make any convincing showing why this deletion and the other deviations should be incorporated into the class definition. Accordingly, it is appropriate to maintain the current definition deleting only the "under color of law" requirement so that the class will include "all aliens residing in New York State who have applied or attempted to

---

**2.** In its present motion to decertify, the Secretary did not argue that the class failed to meet the further requirements of Rule 23(b). Satis-faction of these requirements having been previously established upon initial certification, the Court need not re-evaluate the question now.

apply for Medicaid but have been or would be denied on the basis of their alienage."

■ The federal defendant opposes such a definition as overly broad and, as an alternative to decertification, seeks to have the definition narrowed. More specifically, the defendant seeks to have the class definition amended to include "only perrons who otherwise reside in New York State and applied or attempted to apply for Medicaid, since the date Lydia Lewis first applied, and would qualify for Medicaid in New York State on the same statutory bases as plaintiffs allegedly qualify, but for alleged statutory, regulatory, and policy prohibitions against Medicaid benefits to those: (1) who are the beneficiaries of approved immediate relative petitions; (2) on whose behalf immediate relative petitions have been filed with INS; (3) who are the beneficiaries of approved relative petitions; (4) whose applications for stays of deportation have been accepted by INS; (5) who are the beneficiaries of stays of deportation; and (6) who have contacted INS by letter seeking deferred action status."

In support of this proposed definition, the federal defendant relies upon dicta in *Smith v. Schweiker,* 709 F.2d 777 (2d Cir. 1983), criticizing the district court's certification of a broadly defined class. The court there stated:

"We affirm for lack of jurisdiction. While this disposes of the case, we again 'add a word on the class certification.' *Mercer v. Birchman,* 700 F.2d 828 at 835. Although the complaint attacks termination decisions reached in the absence of evidence of medical improvement, the class includes all recipients who received a notice of termination after June 1979, including persons for whom there was evidence of medical improvement, persons who were terminated on other grounds irrelevant to this case and persons who have since been reinstated. For all we can tell, the vast preponderance of the class certified is simply not affected by the legal issue plaintiffs seek to raise. As in *Mercer, id.,* therefore, '[w]e do not see how the court could have found that a class so ... defined met the requirements of F.R.Civ.P. 23(a)(2), (3) and (4).' We again express our confusion as to 'what effect a judgment could have on entirely different claims of other persons ... or what benefit a successful defendant could draw from it.' "

*Id.* 709 F.2d at 781.

Defendant's reliance on *Smith,* however, is misplaced since, unlike that case, the present case involves a class defined precisely in terms of the primary issue in the case, i.e., denial of Medicaid benefits on the basis of alien status. The vast preponderance of the class in the present case, therefore, will be directly affected by the determination of the propriety of excluding aliens from the Medicaid program.

Plaintiffs correctly point out that classes similar to the plaintiff class here have been certified in other cases challenging restrictions on alien eligibility for public benefits:

"In a case challenging a statute which restricted certain non-legal permanent resident aliens' tuition free admission to public schools, the class was defined as 'all children who are over five and not over twenty-one years of age at the beginning of the scholastic year and have been or will be denied admission to the public schools in the State of Texas on a tuition-free basis because of the alienage provisions of section 21.031 of the Texas Education Code.' *In re Alien Children Education Litigation,* 501 F.Supp. 544, 553 (S.D.Tex.1980), *aff'd sub nom. Plyer v. Doe,* 457 U.S. 202 [102 S.Ct. 2382, 72 L.Ed.2d 786] (1982). In a case challenging the interpretation of the term permanently residing in the U.S. under color of law as it related to claims for unemployment compensation benefits, the class was defined as 'all past, present, and future alien claimants of unemployment insurance benefits in the State of Texas who have had or will have their claims denied on the basis of their alienage.' *Ibarra v. Texas Employment Commission,* 598 F.Supp. 104, 105 (E.D.Tex. 1984)."

In light of these precedents, the present class definition is sufficiently well tailored to the issues and proof to be offered in this

litigation, and defendant's motion to narrow the class definition is denied.

### Motions to Intervene

■ Five individuals, Carlos Gonzalez, Ada Williams, Lech Ciesluk, Hutton Griffith, and Alexander Bernshtein, seek to intervene in the lawsuit generally and be designated additional class representatives[3] pursuant to Rule 24(b)(2). Because their claims raise the identical legal issues raised on behalf of the class and the status of their INS petitions make them particularly well suited to act as class representatives, their motion is granted.

Rule 24(b)(2) authorizes intervention in the court's discretion "when an applicant's claim or defense and the main action have a question of law in common." This rule is satisfied here where, despite factual differences between the plaintiffs and the proposed intervenors, a common question of law has been raised. See, e.g., Boone v. Wyman, 295 F.Supp. 1143, 1148 (S.D.N.Y.), aff'd, 412 F.2d 857 (2d Cir.1969), cert. denied, 396 U.S. 1024, 90 S.Ct. 600, 24 L.Ed.2d 518 (1970).

Like the named plaintiffs and the plaintiff class, the proposed intervenors seek declaratory and injunctive relief against federal defendant's denial of Medicaid to them on the basis of its alienage requirements. The proposed intervenors share with the other named plaintiffs and plaintiff class members a common position on the three main legal questions of this case, namely (1) whether the Medicaid statute authorizes any alienage requirement at all, (2) whether such requirement is constitutional within the meaning of the fourteenth and fifth amendments, and (3) what the phrase "residing ... under color of law" means. These shared issues bring the proposed intervenors within the scope of Rule 24(b) and justify granting their motion to intervene.

Designation of at least some of these individuals to act as additional class representatives is also appropriate in light of the fact that two of the class representatives have died. The first of these, Emiline Forbes, was a 94 year old woman who suffered from arteriosclerotic heart disease, a stroke, and diabetes. At the time of her death her application for "deferred action" status with the INS was still pending. Such status has been described as the result of the exercise of administrative discretion when an alien is found to be entitled to law enforcement priority. See INS Deportation Officer's Handbook, p. 372. The second deceased representative, Wilson Flores, was a 5 year old child suffering from leukemia. Having been in the United States for three years, he had applied for an immigration status known as "extended voluntary departure," and his application was granted before his death. Extended voluntary departure involves a determination by the INS that the petitioner should be allowed to remain physically in the United States for a period of time because of a variety of factors including age, physical health, need for medical treatment or qualification for upgraded immigration status in the near future. See 8 C.F.R. § 242.5(a)(2).

The situation of two of the proposed intervenors bears a striking resemblance to that of Emiline Forbes and Wilson Flores and thus would be appropriate additional representatives capable of providing an array of up-to-date factual circumstances that the deceased representatives can no longer supply. Ms. Forbes' situation resembles that of 78–year-old Ada Williams, who suffers from contratures, depression, and an inability to walk, and who had already been granted deferred alien status by the INS. Similarly, Wilson Flores' situation resembles that of 16–year-old Carlos

---

**3.** It should be noted that all five individuals have already had some connection to the case. Pursuant to orders of this Court dated November 26, 1985, March 7, 1986, and March 21, 1986, Messrs. Ciesluk, Griffith, and Bernshtein and Ms. Williams prevailed on motions for preliminary injunctions against the federal defendant's application of its alienage requirement so as to deny them benefits, and thus they all are now receiving Medicaid pending the final determination of the case. Mr. Gonzalez is also now receiving Medicaid pursuant to the parties' agreement to such benefits during pendency of this action. Their applications to intervene were conditionally granted in connection with these applications.

Gonzalez, who suffers from cerebral palsy, and who like Wilson Flores has been granted extended voluntary departure status. Both Ms. Williams and Carlos Gonzalez thus should be designated additional class representatives.

The remaining three proposed intervenors, Messrs. Ciesluk, Griffith and Bernshtein, present a variety of medical circumstances and immigration postures. Mr. Ciesluk's situation is unique. A quadraplegic in need of rehabilitative care, he originally came from Poland approximately 13 years ago. Currently, he has been granted extended voluntary departure status like Flores and Gonzalez, but he received this designation according to an INS policy that awards such status to Polish nationals who entered this country before July 22, 1984.

Mr. Bernshtein, an 87 year old man suffering from arteriosclerotic heart disease with coronary insufficiency and cardiac arrhythmia, emigrated to this country from Israel but originally came from the Soviet Union, where he faced persecution. His nationality alone does not entitle him extended voluntary departure status, as is the case with Mr. Ciesluk. Rather, his immigration status resembles that of Mr. Griffith and those of two current class representatives, Lydia Lewis and Andre Francis, since they are all intended beneficiaries of "relative visa petitions," which are petitions filed on their behalf by certain relatives who are themselves either U.S. citizens or legal permanent residents. *See* 8 U.S.C. §§ 1151(b), 1153(a). These individuals differ only in the degree to which their immigration status has been up-graded by INS. At the lower end is Mr. Griffith, a 35 year old quadraplegic from Guyana whose relative visa petition has yet to be acted upon by the INS. Current class represent-

atives Lewis and Francis have proceeded to the next step, i.e., their petitions have been "approved." Such approval entitles them to apply for the adjustment of their status. *See* 8 C.F.R. § 204.3. Finally, Mr. Bernshtein's immigration posture has moved a step further toward legal permanent resident status. On March 3, 1986, his application for adjustment of status was accepted as properly filed by INS, and he had an interview scheduled for adjustment of status May 7, 1986.

Designation of Messrs. Ciesluk, Griffith, and Bernshtein as additional class representatives adds diversity to the group of class representatives and enhances the likelihood that many different aspects of the class identity will be reflected among its representatives. It has enabled the Court to have before it information with respect to various stages in the process of moving toward legal permanent resident status and various degrees of medical need. Because increased complexity in the circumstances represented by the named plaintiffs should enhance the complete development of the issues, the applications of all of the proposed intervenors is granted.[3a]

### PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT

Plaintiffs' substantive motions seek preliminary injunctive relief on behalf of the plaintiff class and summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs argue that the policy of the federal and state defendants of excluding non-LPR aliens from Medicaid coverage is invalid. More specifically, plaintiffs challenge the lawfulness of the Secretary's regulation establishing the alienage requirement, 42 C.F.R. § 435.402(b), and the companion New York state requirement, 18 NYCRR § 349.3, on three

**3a.** The most recent applications of Celia Teran and Patricia Arias to intervene pursuant to Rule 24(b)(2) and be designated additional class representatives are also granted for similar reasons. Both intervenors raise the same legal issues discussed above that are raised by the other intervenors and the class as a whole. Thus, they also satisfy the requirement of Rule 24(b)(2) that the intervenor's action and the main action share a common question of law.

Additionally, they should be designated as class representatives because they would further diversify the interests and character of the class representatives. Ms. Teran is the only intervenor granted a visa extension by the INS, and she also has a pending application for deferred action status. Ms. Arias, like Mr. Griffith, has a pending relative visa petition, but she has been in this country for a much longer period of time, i.e., eight years rather than three years.

grounds: first, that they violate the Medicaid statute itself; second, that they offend constitutional principles of due process; and finally, that the federal defendant's interpretation of the "under color of law" requirement is improperly narrow. The Court need not reach these last two arguments, however, since it finds that the disputed regulations are not authorized under the Medicaid statute. According, plaintiffs' motion for summary judgment is granted, thereby rendering moot their motion for a preliminary injunction.

Medicaid was originally enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* The Second Circuit has described the program as "a cooperative federal/state cost-sharing program designed to enable participating states to furnish medical assistance to persons whose income and' resources are insufficient to meet the costs of necessary medical care and services." *DeJesus v. Perales,* 770 F.2d 316, 318 (1985).

An examination of the language of the Medicaid statute, as all parties agree, reveals that it includes neither an express alienage restriction nor any residency requirement similar to that set forth in the HHS regulation under attack. Nor does the Act set forth anywhere a single statement of criteria establishing eligibility for Medicaid. Rather, separate eligibility standards are set forth for each type of program authorized by the statute. Thus, consideration of whether a single criterion applies to all these programs requires an examination of the separate programs and their accompanying eligibility standards.

There are generally two sets of persons eligible for Medicaid: the "categorically needy" and the "medically needy." *DeJesus v. Perales, supra* at 318. Roughly speaking, the categorically needy are those who earn no more than that necessary to cover the necessities of life; the medically needy differ in that it is only the expense of necessary medical care that strains their ability to pay for basic necessities. *See id.* at 321.

The above description provides about the only simple statement that may be made about the persons that a state Medicaid plan may cover. The complex set of standards for state Medicaid programs is set out largely in 42 U.S.C. § 1396a [4] Section 1396a(a)(10)(A) describes the categorically needy as divisible into two subgroups. The first subgroup is defined in § 1396a(a)(10)(A)(i) ("Subsection (i)") as a mandatory group, that is, all states participating in the Medicaid program must provide Medicaid coverage to these individuals. This subgroup will be referred to as the "mandatory categorically needy." The second subgroup is defined in § 1396a(a)(10)(A)(ii) ("Subsection (ii)") as an optional group, that is, participating states have the option to determine whether they will extend Medicaid to this subgroup. This subgroup will be referred to as the "optionally categorically needy" or the "optional categories" program. Finally, § 1396a(a)(10)(C) authorizes states to include another optional group in their Medicaid programs, the medically needy.

New York joined the Medicaid program in 1966. The New York State Department of Social Services was authorized to establish a Medicaid plan covering all the categories of eligible individuals under the federal Medicaid statute. *DeJesus, supra* at 319. Thus, the New York plan includes the mandatory categorically needy, the optionally categorically needy, and the medically needy.

The mandatory categorically needy are described in Subsection (i) as follows:

"A state plan for medical assistance must—

(10) provide—

(A) for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5) and (17) of section 1396d(a) of this title, to—

(i) all individuals—

(I) who are receiving aid or assistance under any plan of the State approved under subchapter I, X, XIV, or

---

**4.** Unless otherwise stated, all section references will be to 42 U.S.C. (1982).

XVI [5] of this chapter, or part A or part E of subchapter IV of this chapter (including individuals eligible under this subchapter by reason of section 602(a)(37) or 606(h) of this title, or considered by the State to be receiving such aid as authorized under section 614(g) of this title),

(II) with respect to whom supplemental security income benefits are being paid under subchapter XVI of this chapter, or

(III) who are qualified pregnant women or children as defined in section 1396d(n) of this title."

Subsection (i)(I) refers to individuals who are actually receiving benefits under the other cooperative federal/state assistance programs, such as aid to the blind or to the permanently disabled. The most notable of these cooperative programs for our purposes is Aid to Families with Dependent Children ("AFDC"). Subsection (i)(II) describes recipients of Supplemental Security Income Benefits ("SSI").[6] Subsection (i)(III) describes two subgroups: (1) children under 5 who meet the income and resources requirement of the state's AFDC plan, 42 U.S.C. § 1396d(n)(2), and (2) pregnant women whose pregnancies are medically verified and who would be eligible for AFDC if the child had been born already and was living with the mother, 42 U.S.C. § 1396d(n)(1). These two subgroups will be referred to as "AFDC-related children under 5" and "AFDC-related pregnant women." Finally, plaintiffs correctly point out that another subsection of the Medicaid statute, § 1396a(a), (e)(4), requires the inclusion of another group in all participating state plans, i.e., babies born to women who are recipients of Medicaid at the time of the

child's birth. 42 U.S.C. § 1396a(e)(4). The Medicaid statute thus requires all state programs to cover five groups: (1) recipients under other cooperative federal/state programs (primarily AFDC), (2) SSI recipients, (3) AFDC-related children under 5, (4) AFDC-related pregnant women, and (5) babies born to recipients of Medicaid as of their birth.

The optionally categorically needy are defined in Subsection (ii) as follows:

"A state plan for medical assistance must—

(10) provide—

(A) for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5) and (17) of section 1396d(a) of this title, to—

(ii) at the option of the State, to any group or groups of individuals described in section 1396d(a) of this title (or, in the case of individuals described in section 1396d(a)(i) of this title, to any reasonable categories of such individuals) who are not individuals described in clause (i) of this subparagraph but—

(I) who meet the income and resources requirements of the appropriate State plan described in clause (i) or the supplemental security income program (as the case may be),

(II) who would meet the income and resources requirements of the appropriate State plan described in clause (i) if their work-related child care costs were paid from their earnings rather than by a State agency as a service expenditure,

---

**5.** The cross references in this section are as follows:

Subchapter I: Old Age Assistance for Puerto Rico, Guam, and the Virgin Islands
Subchapter X: Aid to the Blind
Subchapter XIV: Aid to Permanently and Totally Disabled
Subchapter XVI: Supplemental Security Income
Subchapter IV: Aid for Dependent Children ("AFDC")

**6.** SSI may be either a cooperative federal/state program, thus its mention in Subsection (I), or

a pure federal program, thus a second mention in Subsection (II). Where states do not participate in an SSI program, which is not the case in New York, they have the option to have some more flexibility in their eligibility standards for Medicaid. They can extend Medicaid to SSI recipients as discussed above under Subsection (i)(II), .or under section 1396(a)(10)(A)(i) can cover aged, blind, and disabled persons who meet eligibility criteria no more restrictive than those in effect on January 1, 1972.

(III) who would be eligible to receive aid under the appropriate State plan described in clause (i) if coverage under such plan was as broad as allowed under Federal law,

(IV) with respect to whom there is being paid, or who are eligible, or would be eligible if they were not in a medical institution, to have paid with respect to them, aid or assistance under the appropriate State plan described in clause (i), supplemental security income benefits under subchapter XVI of this chapter, or a State supplementary payment,

(V) who are in a medical institution, who meet the resource requirements of the appropriate State plan described in clause (i) or the supplemental security income program, and whose income does not exceed a separate income standard established by the State which is consistent with the limit established under 1396b(f)(4)(C) of this title, or

(VI) who would be eligible under the State plan under this title if they were in a medical institution, with respect to whom there has been a determination that but for the provision of home or community based services described in section 1396n(c) of this title they would require the level of care provided in a hospital, skilled nursing facility or intermediate care facility the cost of which could be reimbursed under the State plan, and who will received home or community based services pursuant to a waiver granted by the Secretary under section 1396n(c) of this title."

This subsection allows states to cover individuals who do not qualify under Subsection (i). More precisely, this subsection authorizes Medicaid in seven categories of individuals [7] who are listed in section 1396d(a) as individuals who are:

(i) Under the age of 21 or, at the option of the State, under the age of 20, 19, or 18 as the State may choose. § 1396d(a)(i);

(ii) caretaker relatives living with a child who "is (or would, if needy, be) a dependent child" under AFDC. § 1396d(a)(ii) ("AFDC-related caretaker relatives");

(iii) 65 years of age or older. § 1396d(a)(iii);

(iv) blind. § 1396d(a)(iv);

(v) 18 years of age or older and permanently and totally disabled. § 1396d(a)(v);

(vi) an "essential" person, defined as spouses living with the recipients of benefits under title I, X, IX, or XVI. § 1396d(a)(vi);

(vii) pregnant women. § 1396d(a)(viii).

These seven categories of individuals are eligible under the optional categories program, however, only if they also fit within one of the six categories of need listed in Subsection (ii) because they are individuals:

(I) who meet the income and resources requirements of the appropriate State plan described in clause (i) or the supplemental security income program, or

(II) who would meet the income and resources requirements of the appropriate State plan described in clause (i) if their work-related child care costs were paid from their earnings rather than by a State agency as a service expenditure, or

(III) who would be eligible to receive aid under the appropriate State plan described in clause (i) if coverage under such plan was as broad as allowed under Federal law, or

(IV) who are receiving, are eligible for, or would be eligible for SSI, AFDC, or other federal/state benefits program if they were not in a medical institution, or

(V) who are in a medical institution, who meet the resource requirements of SSI or AFDC, and whose income meets a standard set by the State, or

(VI) who would be eligible for Medicaid if they were in a medical institution, but who instead receive home or community based services.

---

**7.** Section 1396d(a) actually contains eight listings, but two of these subsections (iv) and (vii) both refer to the blind. The subsections differ merely in that (iv) applies to states eligible to participate in SSI and (vii) applies to those that are ineligible.

Generally speaking, then, the optionally needy subgroup includes minors, the elderly, the blind, the disabled, pregnant women, the spouses of SSI recipients or AFDC-related caretaker relatives, if they are "needy" according to the income and resource requirements of the AFDC and SSI cash benefit programs. These seven categories of needy people, then, are permissible categories for which participating states may provide Medicaid, if they so choose.

The third group of Medicaid eligible individuals, the medically needy, is authorized under § 1396a(a)(10)(C). Like the optional categories program, the medically needy program includes the seven categories of individuals listed in § 1396d(a), i.e., minors, the elderly, the blind, the disabled, pregnant women, spouses of SSI recipients or AFDC-related caretaker relatives. But a broader range of these individuals may be eligible under the medically needy category, since it applies less stringent income and resource requirements than those applied to the optionally categorically needy. Although states generally have flexibility to determine eligibility under the medically needy category, see § 1396a(a)(10)(C), once they choose to cover the medically needy, they are required to cover two groups of individuals: (I) individuals under the age of 18 who, but for income and resources, would be eligible for medical assistance as an AFDC or SSI recipient covered under Subsection (i) (the mandatory categorically needy), and (II) pregnant women, during the course of their pregnancy, who, but for income and resources, would be eligible for medical assistance as an AFDC or SSI under Subsection (i) (the mandatory categorically needy). Thus, all states choosing to extend Medicaid to the medically needy must extend it to children under 18 and pregnant women who meet the non-financial eligibility requirements of SSI and AFDC. These two groups will be referred to as the "mandatory medically needy."

## DISCUSSION

The question presented here is whether the Secretary's alienage requirement set forth in regulations promulgated to carry out the Medicaid program was either originally authorized in the Medicaid statute or subsequently ratified by Congress. Defendants do not dispute that, if the requirement was neither mandated or subsequently ratified by Congress, the Secretary's regulation must be void as beyond the limits of his statutory authority. The regulation at issue provides in pertinent part:

"The agency must provide Medicaid to otherwise eligible residents of the United States who are—

"(b) Aliens lawfully admitted for permanent residence of permanently residing in the United States under color of law, including any alien who is lawfully present in the United States under section 203(a)(7) or section 212(d)(5) of the Immigration and Naturalization Act."

42 C.F.R. § 435.402(b). The language of the companion state regulation closely tracks this provision. See 18 NYCRR § 349.3.[8] It is undisputed that the regulation is currently being applied to exclude from Medicaid coverage all resident aliens who do not fit the categories described in the regulation.

The Secretary attempts to demonstrate that this regulation was within the scope of his statutory authority as of the time it was originally adopted by the Secretary in 1973 by arguing first that the Medicaid statute incorporates by reference the alienage requirements explicitly set forth in both the AFDC and SSI statutes. Such incorporation is clear with respect to the mandatory categorically needy, who are

---

**8.** Thus, a finding that the federal regulation exceeds the Secretary's authority under the Medicaid Act necessarily implies that the state regulation is invalid also. There is no dispute that a state participating in programs under the Social Security Act may not create eligibility standards unless Congress has clearly indicated that it may do so. *See, e.g., Miller v. Youakim,* 440 U.S. 125, 133–34, 99 S.Ct. 957, 963, 59 L.Ed.2d 194 (1979); *Carleson v. Remillard,* 406 U.S. 598, 600, 92 S.Ct. 1932, 1934, 32 L.Ed.2d 352 (1972); *Townsend v. Swank,* 404 U.S. 282, 286, 92 S.Ct. 502, 505, 30 L.Ed.2d 448 (1971); *King v. Smith,* 392 U.S. 309, 333, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968).

those actually receiving AFDC and SSI benefits. The Secretary argues that in order to be presently receiving AFDC or SSI benefits (together referred to as the "cash assistance programs"), these individuals must have satisfied the alienage requirement included in both programs, that they are "permanently residing in the United States under color of law." *See* 42 U.S.C. § 602(a)(33) (the AFDC statute); 42 U.S.C. § 1382c(a)(1)(B) (the SSI statute). Thus, because the plain language of this subsection conditions Medicaid eligibility upon receipt of cash benefits, this provision, the Secretary argues, incorporates the under color law requirement into the Medicaid statute.

This argument, however, only applies to one of the three groups that may be part of a state Medicaid program. As the Secretary acknowledges, however, this mandatory categorically needy section is the least relevant to the present discussion, since as non-LPR aliens none of the plaintiffs is presently receiving AFDC and SSI benefits precisely because of the alienage requirements included in these programs. Plaintiffs thus do not rely on the mandatory categorically needy section of the Medicaid statute to establish their Medicaid eligibility. Rather, they seek to qualify as members of the other two Medicaid groups, the optionally categorically needy and the medically needy, sections 1396a(a)(10)(A)(ii) and 1396a(a)(10)(C). With regard to these provisions, the Secretary argues that the legislative history of the most recent amendments to the Medicaid statute establishes that Congress intended to tie Medicaid eligibility to eligibility for the cash assistance programs just as it did for the mandatory categorically needy group described above.

The current form of the optional categories program was established by Section 137 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. 97–248 ("TEFRA"). The House Conference Report accompanying this provision noted that its purpose was to "make explicit current law related to coverage of the optional categorically needy, as reflected in current regulation at 42 C.F.R. §§ 435.210 *et seq.*" House Conference Report No. 97–760 at 441, *reprinted in* 1982, USCCAN 1190, 1221. The Secretary argues that such current law would include the regulation at issue in this case. Even more importantly, the Secretary argues, the Conference Report explicitly adopts his understanding of the eligibility requirements for the optional categories program: namely, individuals will qualify for inclusion in this group only if they satisfy the non-financial eligibility requirements of the cash benefits programs including the alienage requirement. The report provides in pertinent part:

> "[T]he states continue to have the authority to provide coverage, at their option, to any or all of the following optional categorically needy groups: individuals who would be eligible for AFDC if child care costs were paid from earnings; individuals under age 21 who would be eligible for AFDC but do not qualify as dependent children; individuals who would be eligible for AFDC if coverage under the state's AFDC plan were as broad as allowed under title IV–A; individuals receiving only optional state supplements; and individuals in institutions who are eligible under a special income level."

H.Rep. No. 757, Pt. 1, 97 Cong.2d Sess. 12–33. According to the Secretary, such constant references to "individuals who [otherwise] would be eligible for AFDC" demonstrates that Congress intended to define the optionally categorically needy as those who would satisfy the non-financial eligibility criteria of AFDC but are not now receiving benefits for a variety of reasons.[9]

With regard to the medically needy, the Secretary makes a similar argument for an alienage requirement based completely upon legislative history. The original authorizing section, then § 1396a(a)(10), pro-

---

9. The Secretary lists these possible reasons for why such individuals may not be receiving AFDC: They choose not to receive benefits; they are institutionalized; the state pays their child care costs; or their state's AFDC plan is not as broad as allowed. *See* Secretary's Brief in Opposition, p. 20 n. 7.

vided in pertinent part that the medically needy included "all individuals who would, if needy, be eligible for aid or assistance under ... State [cash assistance] plan and who have insufficient ... income and resources to meet the costs of necessary medical or remedial care and services...." Such language, the Secretary argues, demonstrates that, when Congress first enacted the Medicaid program, it intended to include within the medically needy group only those satisfying the non-financial eligibility requirements of the cash assistance programs, including their alienage requirement. See also the original Senate and House Reports accompanying the 1965 legislation, S.Rep. No. 404, 89th Cong. 1st Sess. 1965, *reprinted in* USCCAN 1943, 1950; H.Rep. No. 213, 89th Cong. 1st Sess. 66–67 (1965), U.S.Code Cong. & Admin. News 1965, p. 1943. The original wording of this provision, however, was eliminated with the passage of the Omnibus Reconciliation Act of 1981 ("OBRA"), P.L. 98–35, which enacted the present form of § 1396a(a)(10)(C). This new provision contains no description of the medically needy at all but rather merely requires states to "include a description of (I) the criteria for determining eligibility of individuals in the [medically needy] group...." 42 U.S.C. § 1396a(a)(10)(C). Nevertheless, again citing portions of the House and Senate reports accompanying the provisions, the Secretary argues that this change in language was not intended to expand the substantive definition of the medically needy but only to provide the states with greater flexibility regarding another factor that this provision deals with, namely, the types of medical services that must be provided under the medically needy program. *See, e.g.,* H.Rep. No. 97–208 1st Sess. at 971 (1981), *reprinted in* 1981 USCCAN 396, 1010, 1333. Therefore, the Secretary concludes, the incorporation of the alienage requirement of the AFDC state into the eligibility criteria for Medicaid's medically needy program continued even after OBRA.

All of the Secretary's arguments referred to so far have supported its position that, at the time of the promulgation of the alienage requirement in 1973, the Secretary was acting in a manner consistent with the congressional intent underlying the Medicaid statute. Additionally, the Secretary argues in the alternative that, regardless of its original intent, in the period following 1973 Congress acquiesced in and ratified the Secretary's regulation. As evidence of such congressional acquiescence, the Secretary relies on statements in the legislative history of other legislation: namely, the Food Stamp amendments of 1977 and two proposed immigration reform bills. The House Report accompanying the 1977 amendments to the Food Stamp program, the Secretary argues, evinces Congress' specific knowledge of the existence of the Secretary's alienage requirement. It notes that "[i]n 1973, HEW issued rules that banned participation by aliens in SSI and two other welfare programs, AFDC and Medicaid," but the report in no way expressed disapproval of these rules promulgated by the Secretary. More recently, several reports accompanying immigration reform bills which were never enacted into law explicitly express the belief that aliens are ineligible for Medicaid. The Report of the House Committee on Energy and Commerce accompanying proposed H.R. 1510, the Immigration Reform and Control Act of 1983, states that "nor—as undocumented or illegal aliens—are they covered by publicly financed health programs." H.Rep. 98–115, Part 3 at 3. Similarly, the cost estimate of the proposed bill prepared by the Congressional Budget office stated that "Medicaid ... now require[s] recipients to be citizens or have resident status." *Id.* Pt. 1 at 103. Finally, the Senate Report accompanying the current immigration reform bill, S. 1200 (1985), also explains that Medicaid is currently unavailable to aliens: "legalization of unauthorized aliens would entitle the aliens to receive benefits from a number of Federal assistance programs for which they are currently ineligible." S.Rep. No. 99–132, 99th Cong. 1st Sess., 62 (Congressional Budget Office Cost Estimate). Legislative history such as this, the Secretary concludes, demonstrates that Congress was aware of and acquiesced in the current federal policy limiting alien eligibility for Medicaid, and

awareness and acquiescence can establish congressional ratification. *See, e.g., Haig v. Agee,* 453 U.S. 280, 300–02, 101 S.Ct. 2766, 2778–79, 69 L.Ed.2d 640 (1981); *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).

Upon examination, the Secretary's arguments based on legislative history are not very convincing because of the fragmentary nature of the legislative history they rely on, some of it having no relationship to the Medicaid statute whatsoever and none dealing directly with the specific provisions of the Medicaid statute supposedly being interpreted. Perhaps this is so because a close look at the plain language, structure, and purpose of the statute, in addition to its legislative history, establishes that Congress never intended to prescribe an alienage requirement and that the Secretary's regulation, accordingly, is invalid as beyond the statutory scope of the Secretary's authority.

First, the plain language of the statute, as noted above, contains no express restrictions on alien eligibility whatsoever. Perhaps, even more important in terms of the Secretary's arguments, the statute contains no provision expressly adopting for all purposes the non-financial eligibility requirements applicable to SSI and AFDC. This is illustrated by the optional categories program which contains several references to AFDC and SSI. Among the six categories of need listed as comprising the optionally categorically needy, three describe individuals explicitly in terms of the financial criteria of AFDC and SSI. Subsection I includes those who "meet the income and resource requirements" of these programs; Subsection II includes those who would meet those financial requirements if they paid for their own child care costs; and Subsection V includes those who actually meet the financial requirements of AFDC and SSI but are in a medical institution. The explicit reference to the "income and resource requirements" of AFDC and SSI clearly suggests that other prerequisites

for obtaining benefits under those programs, for example, those relating to the applicant's status under our immigration laws, are not incorporated into the Medicaid program.

To be sure, two of the three remaining categories of the optional categories program, those set forth in subsections III and IV, speak in terms of individuals who "are [or] would be eligible" for AFDC or SSI.[10] However, it is clear from the context in which the expression eligibility is used that eligibility in terms of the cash and resource requirements of AFDC and SSI is being spoken of. Finally, it bears noting that the medically needy program does not speak in terms of eligibility for AFDC or SSI at all, 42 U.S.C. § 1396a(a)(10)(C); and thus, it cannot be said that the non-financial eligibility requirements of these programs were incorporated into this third Medicaid program either.

The language of the statute thus does not support the Secretary's argument that the legislative history of TEFRA, which enacted the current form of the optional categories program, suggests that Congress intended to incorporate the non-financial eligibility requirements of AFDC and SSI into the Medicaid program across the board. The Secretary's assertion that the congressional reports' use of the phrase "would be eligible for AFDC" was intended to refer to a single set of eligibility requirements for all categories of claimants in fact suggests that only the financial requirements were meant to be incorporated into Medicaid since those are the only type of eligibility requirements explicitly mentioned.

Other aspects of the Medicaid program also reveal the unsoundness of the Secretary's position. The alienage requirement of the cash assistance programs is only one of several non-financial prerequisites of these programs that are not expressly incorporated into the Medicaid statute. Thus, as a prerequisite to obtaining AFDC,

---

**10.** Subsection VI speaks in terms of eligibility "under the State plan under this title," i.e., Medicaid, rather than in terms of AFDC or SSI.

for example, an individual must participate in the WIN training and employment program unless he or she falls within one of the few exceptions of the programs, 42 U.S.C. § 602(a)(18), engage in a job search, 42 U.S.C. § 602(a)(35), and not be a striker, 42 U.S.C. § 602(a)(21)(B), and children must be living with one of several specified relatives in order to qualify, 42 U.S.C. § 606(a). None of these requirements is expressly incorporated into either the optional categories or medically needy programs. *See* § 1396a(a)(10)(A)(ii), (C). Similarly, to qualify for SSI, an individual cannot be a blind or disabled individual over 15 and under 65 who refuses vocational and rehabilitation services without good cause, 42 U.S.C. § 1382d(c), but no Medicaid provision expressly applies this requirement to the optional categories or medically needy programs. Thus, if the Secretary is correct in his argument that the alienage requirement of the cash assistance programs applies to Medicaid because all of the non-financial eligibility requirements of AFDC and SSI are impliedly incorporated into the Medicaid statute, then a plethora of eligibility requirements would be tacked onto an already labyrinthian statute. Nothing in the legislative history or in the Secretary's administrative practice suggests that such an interpretation is proper. *Compare Quern v. Mandley,* 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978).

■■■ Another aspect of the Medicaid statute also shows the weakness of the Secretary's position. As already suggested, each category of eligibility, the mandatory categorically needy, the optionally categorically needy, and the medically needy, explicitly authorizes Medicaid for some groups of individuals who meet only the general financial eligibility requirements of AFDC and SSI. The inclusion of such groups by Congress contradicts the Secretary's argument that Congress intended that the non-financial criteria of these programs be incorporated across the board into Medicaid. This decision has already pointed out that the optional categories

program authorizes states to cover three groups of individuals that satisfy only the financial requirements of AFDC and SSI. In a similar fashion, both the mandatory categorically needy and the medically needy programs also authorize states to cover individuals satisfying only the financial requirements of AFDC and SSI. For example, under the mandatory categorically needy program, all states are not only authorized but are required to provide Medicaid to, *inter alia,* children under five "who meet the income and resource requirements" of AFDC. § 1396a(a)(10)(A)(i)(III). In the absence of any mention of a need to meet the non-financial requirements of AFDC, including the alienage requirement, this section makes clear that states must extend Medicaid eligibility to all children who are as poor as those receiving AFDC, regardless of whether they meet the specific requirements of the AFDC "dependent child" designation or whether they are American citizens, permanent residents, or non-LPR aliens. Similarly, the medically needy include those individuals who are under age 21, pregnant, 65 or over, blind or disabled without any mention of the AFDC or SSI statutes whatsoever,[11] *see also* § 1396a(a)(10)(A)(ii).

Established rules of statutory interpretation hold that, when a statute is plain on its face, it is not necessary to resort to legislative history as a guide to the statute's meaning. *Connecticut v. U.S. Environmental Protection Agency,* 656 F.2d 902, 909 (2d Cir.1981); *Meade Township v. Andrus,* 695 F.2d 1006 (6th Cir.1983). Examination of the statute to this point suggests that it is plain on its face with regard to the argument that the alienage requirement and other non-financial prerequisites of AFDC and SSI were incorporated into Medicaid. However, if only because of the complexity of the statute, a brief review of the legislative and administrative history of Medicaid is appropriate.

From Medicaid's inception in 1965 until the promulgation of the Secretary's alien-

---

**11.** One subgroup that does refer to these statutes authorizes Medicaid for "essential" persons defined spouses of SSI recipients, without any regard for whether the essential person would also qualify for SSI.

age requirement in 1973, New York State provided federally participating Medicaid benefits to all otherwise eligible aliens. Originally, the Department of Health, Education and Welfare ("HEW"), HHS' predecessor, routinely approved state plans, including New York's, without regard to alien eligibility restrictions. Indeed, prior to 1971, there were no federal regulations whatsoever addressing alien eligibility. Then, in 1971 HEW promulgated regulations markedly different from that under review today. They provided for federal participation in state Medicaid programs including resident aliens, and, in some circumstances, required Medicaid coverage for all otherwise eligible aliens. 45 C.F.R. § 248.50; 36 Fed.Reg. 3872 (1971); HEW Handbook on Public Assistance Administration (1966)[12] New York was among those required by HEW to provide coverage for all otherwise eligible aliens. Thus, for the first eight years of the program's existence, the Secretary interpreted the statute to require the provision of federal financing for Medicaid services extended to resident aliens. In fact, on June 16, 1972, the Secretary proposed a regulation that would require rejection of any state Medicaid plan that would "exclude an otherwise eligible individual on the basis ... of his alien status," 37 Fed.Reg. 1977 (1972) (intended for codification at 42 C.F.R. § 248.50), and would thus have effectively mandated that all states provide Medicaid coverage to all otherwise eligible aliens. The proposed regulation never became final, however, and in the following year an alienage requirement was adopted by the Secretary, although no relevant Congressional amendment of the statute signaled that such a change was appropriate.

Rather, shortly before this, Congress created the SSI program, and the Secretary candidly acknowledges that the language of its alienage requirement was copied from such a requirement in the new SSI program. 38 Fed.Reg. 30, 259 (1973); *see* Social Security Act Amendments of 1972, § 1614, Pub.L. No. 92–603, Title III, § 301, 86 Stat. 1329, 1471 (1972). The Secretary incorporated the SSI alienage requirement even though Congress had amended the Medicaid statute at the same time in the same Act and did not provide any such restriction for Medicaid. *See* Social Security Amendments of 1972, Pub.L. No. 92–603, 86 Stat. 1329 (1972); H.Rep. 92–231, 92 Cong. 2d Sess., *reprinted in* 1972 USCCAN 4989, 5052–5107. It was not until nine years later that a similar alienage requirement was incorporated into AFDC by Congress in the 1981 OBRA statute. As the Secretary himself acknowledges, OBRA simultaneously amended the Medicaid statute; again, it did not provide any similar alienage requirement in Medicaid.

In OBRA, as discussed above, Congress changed the definition of the medically needy to allow the states more flexibility to determine the sorts of services that must be provided. The Secretary argues, moreover, that statements in the accompanying House Report demonstrate that, in so amending the medically needy provision, Congress had no intention of allowing states to cover individuals "not covered under current laws." H.Rep. No. 97–208 1st Sess. at 971 (1981), *reprinted in* 1981 USCCAN 1010, 1333. As of the time OBRA was enacted, however, i.e., 1981, Congress had adopted an alienage requirement only for SSI. As already discussed, it was OBRA itself that inserted a similar requirement into AFDC; and, as the Secretary himself acknowledged, until 1973 the Medicaid statute had never included any such requirement.

At the time of Medicaid's enactment in 1965, the nation's other health care pro-

---

**12.** The regulation reads as follows:

"(a) A State plan under title XIX of the Social Security Act may not exclude an otherwise eligible citizen of the United States, regardless of how (by birth or by naturalization), or when, citizenship was obtained.

(b) A State plan which includes the medically needy must include all otherwise eligible individuals, regardless of citizenship status, unless all of the State's approved financial assistance plans require citizenship as a condition of eligibility.

(c) A State plan may include persons without regard to citizenship status, even though all of the State's approved financial assistance plans contain such a requirement."

gram, Medicare, was also adopted. Social Security Amendments of 1965, Pub.L. No. 89–97, 79 Stat. 286 (1965). Medicare provides medical assistance to the aged and disabled without regard to financial status and is linked to the Social Security program, while Medicaid provides medical assistance to high-risk indigent populations. As defined in 42 U.S.C. § 1396, the purpose of Medicaid is to permit each state, as far as fiscally practicable, to provide federally participating "medical assistance on behalf of aged, blind and disabled individuals whose income and resources are insufficient to meet the cost of necessary medical services," and "to help such individuals attain or retain the capacity for independence." In 1965 Congress considered and imposed restrictions on alien eligibility for Medicare. Part B, See Pub.L. 89–97 § 1836, 79 Stat. 286, 304 (1965); Conf.Rep. No. 682, 89th Cong. 1st Sess., *reprinted in* 1965 USCCAN 1943, 2233–34, but, as occurred later on other occasions, omitted such restrictions from Medicaid (and also from Medicare Part A). Where Congress has demonstrated on several occasions that it knows how to include an alienage requirement when it intends to, and it has omitted the requirement in one program while simultaneously incorporating it into another, such omissions should be viewed as intentional. Such was the view of the Second Circuit in *State of New York v. Heckler*, 719 F.2d 1191, 1197 (1983), when it refused to find that the parental notification requirements of Title XX had been implicitly incorporated into Title X. The court stated flatly:

"Title XX and the 1981 amendment to Title X were enacted at the same time, yet the former specifically included a requirement for parental notification and consent while the latter did not. Obviously, Congress knew how to require parental notice and consent when that was its intention."

*Id.* at 1197. *See also FTC v. Sun Oil Co.,* 371 U.S. 505, 514–15, 83 S.Ct. 358, 364, 9 L.Ed.2d 466 (1963). Congress similarly knew how to impose alienage requirements on social welfare programs when it intended, and its refusal to impose such a requirement on Medicaid should be respected.

Unable to support his argument for the incorporation of an alienage requirement in Medicaid simply on the basis of the legislative history of that statute, the Secretary points to fragmentary legislative history of unrelated and sometimes unenacted legislation in an effort to demonstrate that Congress ratified or acquiesced in the Secretary's regulations. The Second Circuit, however, has cautioned that "[m]ere 'acquiescence or nonaction' is not enough for ratification 'because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws.'" *EEOC v. CBS, Inc.,* 743 F.2d 969 (2d Cir.1984), *quoting Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). *See also Aaron v. SEC,* 446 U.S. 680, 694 n. 11, 100 S.Ct. 1945, 1954 n. 11, 64 L.Ed.2d 611 (1980); *SEC v. Sloan,* 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978). Such purposeful consideration of the Secretary's alienage requirement has not been demonstrated here.

The Secretary relies primarily on the House Report accompanying the Food and Agriculture Act of 1977, which amended the Food Stamp program, Pub.L. 95–113, and had no direct effect on the Medicaid program. Of the 569 pages of the agriculture committee's report regarding the bill, one sentence refers to Medicaid: "In 1973, HEW issued rules that banned participation by aliens in SSI and two other welfare programs, AFDC and Medicaid." H.Rep. No. 464, 95th Cong., 1st Sess., *reprinted in* 1977 USCCAN 1704, 2115. The report clearly fails to show that Congress carefully and purposefully considered the appropriateness of the Secretary's alienage restriction for Medicaid. An examination of the only other proffered evidence of Congressional ratification, i.e., the unenacted bills attempting to effect immigration reform, demonstrates a similar lack of any careful and purposeful consideration of an alienage restriction for Medicaid. The discussion focuses upon eligibility requirements for classification as a legal perma-

nent resident, and the issue of whether those individuals newly designated as legal permanent aliens should be eligible for Medicaid soon after they achieved that status. It does not, however, address the precise question here, i.e., whether an alienage requirement for Medicaid is authorized under current immigration law and policy. As a result, it also fails to establish congressional ratification.

■ Because the Secretary's regulation falls outside the scope of the authority delegated under the Medicaid statute, it is invalid. *See Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974). Therefore, plaintiffs' motion for summary judgment is granted. Plaintiffs are directed within thirty days to settle a form of judgment on ten days notice as necessary to afford relief to plaintiffs and members of the plaintiff class, including notice to class members of the relief to which they are or may be entitled.

In sum, plaintiffs' applications to amend the complaint, to modify the definition of the class, and for summary judgment are granted. The federal defendant's motion to decertify the class is denied. Proposed plaintiff—intervenors' motion to intervene and to become additional class representatives is granted.

SO ORDERED.